UNITED STATES of America,
Plaintiff-Appellee,

v.

Hector ESPINOSA–ORLANDO,
Defendant-Appellant.

No. 81–6207.

United States Court of Appeals,
Eleventh Circuit.

May 2, 1983.
As Amended on Denial of Rehearing
May 2, 1983.
Rehearing and Rehearing En Banc
Denied June 24, 1983.

R. Jerome Sanford, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Charles W. Blau, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY and CLARK, Circuit Judges, and MARKEY,* Chief Judge.

MARKEY, Chief Judge:

After a non-jury trial, Hector Espinosa (Espinosa) was, on November 25, 1981, sentenced to thirteen years imprisonment and a five thousand dollar fine for his conviction on a charge of conspiracy to possess with intent to distribute approximately twenty kilograms of cocaine, under 21 U.S.C. § 846.[1]  He was also sentenced to three

---

* Honorable Howard T. Markey, Chief Judge for the Federal Circuit, sitting by designation.

1. Section 846.  Attempt and conspiracy

   *Any person who attempts or conspires to commit any offense defined in this subchap-*

years concurrent imprisonment for his conviction on a charge of jumping bail, under 18 U.S.C. § 3150.[2] Espinosa appeals only his conviction on the conspiracy charge. We affirm.

## Background

The events that led to the arrest of defendant Espinosa and co-defendant Isaac Kattan-Kassin (Kattan) began in early January 1981, when Drug Enforcement Agency (DEA) agents began surveillance of Kattan, Luis Vieira (Vieira), and Jaime Diaz (Diaz), because of information that they were laundering narcotic proceeds.

On January 28, 1981, Vieira and Diaz were observed at the securities firm of Donaldson, Lufkin, and Jenrette,[3] where an informant indicated they deposited approximately $105,000 from two cardboard boxes.

On January 29, 1981, Kattan, Vieira, and Diaz were observed in a Holiday Inn parking lot, where Kattan removed a satchel from the trunk of his car and placed it in the trunk of a car driven by Vieira and Diaz.

When the Donaldson firm refused to handle further deposits, Kattan, Vieira, and Diaz were seen making deposits at the Great American Bank of Dade County.

In February, Kattan was observed meeting in the Great American Bank with Carlos Nunez (Nunez), a bank official.[4] A DEA agent overheard Nunez say he would handle all of Kattan's future deposits. Kattan and Nunez approached Vieira and Diaz in the bank, and Diaz gave a large brown suitcase to Nunez, who in turn passed it over the teller's cage to the cashiers.

On February 6, 1981, Kattan was observed in the presence of three men, one a known drug trafficker, and to have given a large, heavy suitcase to one of the two unknowns. Kattan was also seen meeting with known drug traffickers Vershish and Moya.[5]

On February 26, 1981, Kattan met with Vieira and Diaz in the Holiday Inn lot. Following a thirty minute conversation, the three left in Vieira's car and drove to a nearby condominium, where they entered and whence, after ten minutes, Kattan and Vieira exited and drove back to the Holiday Inn lot.

Kattan made a telephone call in the Holiday Inn lobby, made a short visit to his residence, then drove to a condominium complex where he entered, using a pass card, having parked in the upper parking lot. He then walked across the parking lot

ter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
(Pub.L. 91–513, title II, § 406, Oct. 27, 1970, 84 Stat. 1265.)

**2.** § 3150. Penalties for failure to appear
Whoever, having been released pursuant to this chapter, willfully fails to appear before any court or judicial officer as required, shall, subject to the provisions of the Federal Rules of Criminal Procedure, incur a forfeiture of any security which was given or pledged for his release, and, in addition, shall, (1) if he was released in connection with a charge of felony, or while awaiting sentence or pending appeal or certiorari after conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both, or (2) if he was released on connection with a charge of misdemeanor, be fined not more than the maximum provided for such misdemeanor or imprisoned for not more than one year, or both, or (3) if he was released for

appearance as a material witness, shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

**3.** Employees of the firm told DEA agent Wilson that during the last fourteen business days of July 1980, over seven million dollars had been deposited in one account in the names, among others, of Vieira and Diaz, and that individuals were continuing to bring in cardboard boxes full of money for deposit.

**4.** DEA agent Wilson had been notified by the Internal Revenue Service that large cash deposits were being made at the Great American Bank without filing IRS currency transaction forms, and that Carlos Nunez was suspected in connection with those non-filings.

**5.** On February 2, 1981, Kattan was seen entering a dwelling before which were parked vehicles registered to Vershish and Fernando Moya, each previously known to the DEA as a trafficker in narcotics.

and entered an adjacent condominium complex through a connecting pedestrian gateway.[6] Shortly thereafter, Kattan left that building with Espinosa. The two had a five minute conversation, during which Kattan repeatedly pointed in the direction of an access road of the complex. The two then walked in opposite directions. Kattan drove repeatedly up and down the avenue fronting the complex, making several illegal U turns before entering the access road and stopping in front of a 1971 Jaguar XJ-6 occupied by Espinosa.

Both cars then proceeded to the area of Biscayne Boulevard and N.E. 4th Street, where Espinosa parked in a median parking area and Kattan parked at the corner. Espinosa conversed with Kattan, who pointed to the median parking area. Kattan walked over to a white Citation parked near the corner and spoke to the driver. Espinosa parked the Jaguar across the median from the Citation. The Citation's driver removed a large red suitcase from his trunk. Espinosa carried the suitcase with some difficulty across the median and placed it in his Jaguar, DEA agents noticing that the rear lowered noticeably as he did so.[7] Kattan and Espinosa shook hands and Espinosa departed, waving as he drove away. Kattan and the Citation's driver returned the wave.

Espinosa was followed by DEA agents Villar and Bunnell in one car, and by DEA supervising agent Coonce and IRS agent Sands in another, to a Firestone Tire store, where his brother Orlando entered the Jaguar. As Espinosa drove from the store, DEA agent Bunnell observed that he seemed very nervous and was looking around inside the Jaguar. Informed of Espinosa's behavior, supervising agent Coonce decided to stop him.

Agents Villar and Bunnell drove alongside the driver's side of the Jaguar and placed a blue light on their car. Agents Coonce and Sands approached the Jaguar from behind. When all cars stopped, all four agents drew their weapons and identified themselves as Federal Officers.

Espinosa and his brother were asked to step from the car, were subjected to a pat-down search for weapons, and were then requested to lie on the grass alongside the roadway where a further pat-down search was conducted.

Agent Bunnell moved Espinosa's Jaguar to the sidewalk to clear traffic. Agent Villar took the keys from the Jaguar, knelt before Espinosa, and asked him in a conversational tone,[8] "Are these your keys?" Espinosa replied "Yes". Villar then asked "Do I have your permission to look in, to open the trunk of your car and look inside the suitcase?" and Espinosa answered, "Yes, yes". Bunnell twice asked Espinosa "What do you have in your car?" Each time Espinosa replied, "I do not have anything".

Agent Villar discovered in the suitcase what appeared to be cocaine, wrapped in approximately one kilogram packages.[9] Espinosa was then told he was under arrest for possession of cocaine and was told his "*Miranda*" rights.[10]

On the way to DEA Headquarters, Espinosa asked Agent Villar "How did you know that I had coke inside the suitcase?". When Villar said, "I didn't", Espinosa stated, "Sure, sure".

At DEA Headquarters, Agent Villar sat down with Espinosa in one of the interview rooms near the hold cells and asked Espinosa: "What were you supposed to do with

---

6. When Kattan visited the building on February 6, 1981, he told the guard he wished to visit Jose Estupinan, who had been arrested in 1979 in Columbia for possession of 585 kilograms of cocaine.

7. During this exchange, Kattan stood approximately seven feet behind the Citation, looking all around and watching the transfer of the suitcase.

8. All conversations with Espinosa were conducted in Spanish.

9. Approximately twenty kilograms of 98% pure cocaine was recovered from the suitcase.

10. Espinosa's criminal history sheet on file with the Federal Bureau of Investigation indicates he had been arrested before February 26, 1981.

that suitcase you had with you?", to which Espinosa replied, "I should have taken that suitcase over to Coral Way and S.W. 22nd Avenue". Villar asked, "Then what?" and Espinosa responded, "I should give same to a couple of Latin males waiting at that location in a maroon colored Chevrolet, older model". Villar again asked, "Then what?" and Espinosa replied, "Then they should give me another suitcase in which I should return same to Mr. Kattan". Espinosa also stated that Kattan, whom he knew for two years, had given him the red suitcase. After saying that a friend brought him to Kattan, Espinosa announced that he would make no further statement at that time and the interrogation was terminated.

Kattan was thereafter arrested and found to have in his shirt pocket a piece of paper bearing Espinosa's name and telephone number.

### Issues

(1) Whether there was probable cause to stop Espinosa;

(2) whether the search of the Jaguar's trunk and suitcase was permissible;

(3) whether Espinosa's post-arrest statements to Agent Villar were admissible.

### (1) Probable Cause

■ Probable cause exists when under the circumstances a reasonable person would be led to believe that a crime has been or is being committed. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The Fifth Circuit has determined that probable cause is a factual determination in light of the collective knowledge and experience of the agents involved. *United States v. Clark,* 559 F.2d 420 (5th Cir.1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). In *Clark,* 559 F.2d at 424, the court quoted from the opinion of Judge (now Chief Justice) Warren E. Burger in *Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966):

"[p]robable cause is the sum total of the layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers, but the laminated total."

■ Probable cause may also be supplied by the "observation of unusual activities where there is no legitimate, logical explanation", *United States v. Alexander,* 559 F.2d 1339, 1343 (5th Cir.1977), *cert. denied,* 434 U.S. 1078, 98 S.Ct. 1271, 55 L.Ed.2d 785 (1978) or where "the suspects were simply not conducting themselves in the manner of typical tourists or businessmen". *United States v. Horton,* 488 F.2d 374, 379 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

■ On the day Espinosa was stopped, the agents had observed codefendant Kattan meeting with Diaz and Vieira, making phone calls, meeting with Espinosa, driving up and down a particular avenue, making illegal U turns, in a manner consistent with a fear of surveillance, and leading Espinosa to the rendezvous with the white Citation and to the suitcase it contained. Espinosa was seen receiving and placing a large suitcase in his Jaguar with some difficulty, shaking hands with Kattan and the Citation's driver, and waiving as he drove away, and then behaving nervously, suggesting involvement in an illegal activity and a desire to avoid detection.

The agent's earlier observations of Kattan added to the basis for the belief that a crime was being committed. From early January 1981, Kattan had been observed as he engaged in suspicious acts. On three occasions he gave large suitcases to individuals. Suitcases were known to be regularly used in narcotics transactions as receptacles for drugs and money. Kattan met with several well-known narcotic traffickers. His associates Vieira and Diaz were observed at the securities firm with two cardboard boxes. An informant confirmed that the boxes contained approximately one hundred and five thousand dollars ($105,000).

In addition, the surveillance of Kattan confirmed what government agents had been told by reliable, confidential sources, i.e., that Kattan associated with drug traffickers, laundered narcotics proceeds, controlled couriers of narcotics and money, and deposited large sums in various accounts.

■ The combination of informant reports, observation of Kattan over time, observation on the day of the stop, and knowledge of narcotic activities in the Miami area, including use of large suitcases, led inexorably to a reasonable belief that Espinosa and Kattan were committing a crime and that the transferred suitcase contained illegal funds or narcotics.[11] We conclude, therefore, that Judge King correctly found probable cause for the stop of Espinosa.

### (2) The Search

The analytical approach in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), requires proof of a legitimate expectation of privacy in the area or thing searched, and that the search violated that expectation, *Id.* at 140, 99 S.Ct. at 428, (*See, Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980), and further requires that a legitimate expectation of privacy be proven by factors beyond mere possession, such as a right to exclude or a right to privacy, *Id.* at 143–144, n. 12, 99 S.Ct. at 430–431, n. 12. *See, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). *United States v. Parks,* 684 F.2d 1078, 1083, (5th Cir.1982). It is undisputed that Espinosa had a legitimate expectation of privacy in his car and thus in its trunk. The government does argue that Espinosa had no such expectation in relation to the suitcase, in which his interest, if any, was that of a bailee having the mere possession set forth in *Rakas* as insufficient to establish a legitimate expectation of privacy. The government points to Espinosa's denials that he had "any-

thing" in the car and to his statement that he was merely transporting the suitcase for Kattan.

■ We need not explore the question of standing to contest the search, however, for Judge King found that Espinosa voluntarily consented to the search of the car and the suitcase. That finding cannot be reversed unless clearly erroneous. *United States v. Turner,* 628 F.2d 461 (5th Cir.1980) *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981); *see United States v. Bowles,* 625 F.2d 526 (5th Cir.1980); *United States v. Robinson,* 625 F.2d 1211 (5th Cir. 1980). In *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973), the Court said voluntariness is a question of fact determined in light of all the circumstances. The court further said that a defendant's knowledge of his right to refuse consent is a factor but not a requirement in determining voluntariness. *Id.*

The Fifth Circuit has said not only that voluntariness must be determined from the circumstances surrounding the consent, *United States v. Horton, supra,* but that the standard remains the same whether the defendant is in custody, under arrest, or merely stopped at the time of consent. *Id.* at 380, n. 4.

■ As did Judge King, we note a striking similarity between the facts here and those in *Horton,* where police investigating a tip concerning drugs were led to Horton and his friends. Horton was seen placing a grey briefcase into the trunk of his parked car and departing for the airport in a taxi. Police stopped him near the airport, ordered him from the taxi, and searched him. They twice asked him if he objected to a search of his car and briefcase. Horton twice said he had no objection and gave the police the keys to his car and briefcase. The court held Horton's consent voluntary, saying the

---

11. Espinosa argues that if probable cause existed to believe he was carrying illicit funds, none existed to believe he was carrying cocaine. The law is well established, however, that where probable cause exists in relation to one

type of contraband and another is found, probable cause exists in relation to the latter. *See, United States v. Stamps,* 430 F.2d 33 (5th Cir. 1970).

police had not "used tactics that would augment the degree of the coercion that is inherent in any arrest," and that failure to advise him of his right to remain silent and to refuse consent was only one factor to be considered. *Id.* at 381.

When Espinosa was asked for permission to search, three agents had reholstered their weapons. The fourth stood apart with his weapon pointed at the ground. Agent Villar asked Espinosa for permission to search in a normal conversational tone. That Espinosa was lying on the ground is one circumstance to be weighed in favor of involuntariness. However, no abusive language or physical threats were at any time directed at Espinosa, who had not been handcuffed, placed within a police vehicle, or transported away from the location of the stop.

Judge King, having considered all of the circumstances, correctly found Espinosa's consent to have been entirely free and voluntary.[12] Hence the search and refusal to suppress its evidentiary fruit were proper.

### (3) *Post-Arrest Statements*

As above indicated, Espinosa made two statements. The first occurred en route to DEA Headquarters, when he asked Agent Villar, "How did you know I had coke inside that suitcase?", to which Agent Villar replied, "I didn't", and Espinosa responded "Sure, sure". The second occurred in an interview room at DEA Headquarters. Agent Villar first asked Espinosa if he understood his constitutional rights. Receiving an affirmative answer, Villar asked "What were you supposed to do with that suitcase you had with you?", to which Espinosa replied, "I should have taken that suitcase over to Coral Way and S.W. 22nd Avenue". Villar asked, "Then what?" and Espinosa responded, "I should give same to a couple of Latin males waiting at that location in a maroon colored Chevrolet, old-

er model". Villar again asked, "Then what?" and Espinosa replied, "Then they should give me another suitcase in which I should return same to Mr. Kattan." Espinosa also said Kattan had given him the red suitcase, and that a friend brought him to Kattan. Espinosa then stated "I wish not to make any more statements at this time."

The first statement is admissible as a voluntary statement not falling under the Fifth Amendment's protection. As the Supreme Court said in *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966):

> "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is of course admissible in evidence.... There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

*See,* 18 U.S.C. § 3501(d).

The evidence shows that Espinosa gave his first statement freely and voluntarily to the DEA agents. It was spontaneously initiated by Espinosa. It was not made during an interrogation. It was in no manner prompted or solicited by the DEA agents, and was free of "any compelling influences". *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630.

The DEA agent had no duty to prevent Espinosa from making the statement and it is clear that such a statement is neither protected by the Fifth Amendment right against self-incrimination, *Id.* at 478, 86 S.Ct. at 1629, nor related in any manner to *Miranda* warning questions. We conclude that the first statement was clearly admis-

12. Espinosa's consent, moreover, was of a piece with his overall position, i.e., that he did not have "anything" in the car, and that he was merely transporting the suitcase for Kattan. Refusal of consent and insistence on a warrant may have been thought by Espinosa to be indicative of guilty knowledge inconsistent with a stance as an innocent transporter unaware of what he was transporting. One may not, however, remove by a voluntary consent the necessity of a warrant, and then obtain suppression of the evidence because the search was warrantless.

sible against Espinosa as a voluntary statement.

■ Espinosa correctly states that admission of the second statement was improper because he was not told of his right to appointed counsel when given his *Miranda* warnings. ·

In *Miranda* 384 U.S. at 479, 86 S.Ct. at 1630, the Supreme Court required that each defendant in custody, before interrogation, be told of his right to remain silent, that anything he says may be used against him, and of his right to have counsel present during questioning and to have counsel *appointed* if he could not afford one. A warning containing all four elements was an "absolute prerequisite" to interrogation. "No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." *Id.* at 471–472, 86 S.Ct. at 1626. *See California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981).

The Fifth Circuit has held improper the admission of statements made by defendants who had not been told of their right to appointed counsel. *United States v. Stewart,* 576 F.2d 50, 54 (5th Cir.1978) (citing thirteen cases from 1967 to 1977 to that effect). *See Montoya v. United States,* 392 F.2d 731, 735 (5th Cir.1968).

The second statement was clearly made during interrogation. Interrogation under *Miranda* is "questioning initiated by law enforcement officers after a person has been taken into custody". 384 U.S. at 444, 86 S.Ct. at 1612. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). When DEA Agent Villar initiated the questioning, Espinosa was in custody, having been arrested, taken to DEA Headquarters, and placed in an interview room.

When arrested, Espinosa was told: "You are under arrest. You have the right to remain silent. Anything that you say can be used against you in the court. You have a right to have a lawyer present when you are being questioned." That warning thus failed to tell Espinosa of his right to have *appointed* counsel present during questioning, and Espinosa was at no other time given a complete version of his rights.

Though he told the DEA agents that he understood his rights, it must under *Miranda* be presumed that he was unaware of his right to appointed counsel. That he had been previously arrested is insufficient to establish that he was aware of all his rights. *Miranda,* 384 U.S. at 471–472, 86 S.Ct. at 1626. The government's argument that the statements were exculpatory is without merit in light of *Miranda,* wherein it was noted that any response, inculpatory or exculpatory, which the prosecution seeks to introduce at trial must be considered incriminating. 384 U.S. at 444, 86 S.Ct. at 1612.

Similarly, the government's attempt to distinguish the questioning here from the "interrogation" referred to in *Miranda* must fail. The questioning of Espinosa was express and designed to evoke an answer. It differs, therefore, in nature from the off-hand remarks of the police in *Rhode Island v. Innis, supra,* and in *United States v. Hackley,* 636 F.2d 493 (D.C.Cir.1980). In *Innis,* for example, the "question" that prompted a response by Innis was a conversation between two officers "to which no response from the respondent was invited", *Id.* 446 U.S. at 302, 100 S.Ct. at 1690, and the Court stated that express questioning would, on the other hand, fall under the *Miranda* rule. *Innis,* 446 U.S. at 300, 301, 100 S.Ct. at 1689.

■ That the second statement was rendered inadmissible by failure of the police to provide a complete *Miranda* warning does not, however, exhaust the inquiry. The Constitution mandates fair, not perfect, trials. In *United States v. Hill,* 430 F.2d 129 (5th Cir.1970), the court stated ·that a conviction following a non-jury trial could be upheld if error in admitting a statement was harmless beyond a reasonable doubt. Relevant factors were there described as whether other evidence depended on the statement, whether the statement was the basis for the conviction, and whether the trial judge appeared to have been swayed by consideration of the statement. *Id.* at 131.

Espinosa's second statement was not a base upon which other evidence depended.

In describing what Espinosa intended to do with the cocaine if he had not been stopped, the statement was at most cumulative. Far from being the basis for conviction, the statement may be deleted without affecting or diminishing the more than sufficient evidence remaining in support of the conviction. Lastly, nothing of record indicates that the second statement swayed Judge King's determination, or, as stated in *Hill,* "affected the district court's finding of guilt". *Id.* at 132. The admission of the second statement was therefore harmless error.

### Conclusion

The government agents had probable cause to stop Espinosa. Espinosa voluntarily consented to the search of the car, its trunk, and the suitcase. The cocaine was therefore admissible. Espinosa's first statement was admissible because it was spontaneously volunteered by him. His second statement was inadmissible because he had not been properly advised of his rights, but its admission was harmless error.

The conviction is AFFIRMED.