960 F.2d 150
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keenan Kester COFIELD, Defendant-Appellant.
 No. 91-5957.
 United States Court of Appeals,
Sixth Circuit.
 April 17, 1992.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In this criminal case, defendant Keenan Kester Cofield was convicted of wire fraud, pursuant to 18 U.S.C. § 1343. Cofield is a scam artist, whose scheme involved causing newspapers to print a false obituary about himself, and then suing for defamation and intentional infliction of emotional distress. We affirm, holding that the district court did not err in allowing the introduction of defendant's statement, which had been given during an FBI interview in jail. We also hold that defendant's 60 month sentence, based on an upward departure for "loss of confidence" in the judiciary, was not clearly erroneous.
 
 
 2
 * On or about February 14, 1989, the Chattanooga Times ("the Times ") ran an obituary for Keenan Kester Cofield, stating that he was survived by a wife and daughter. On February 24, 1989, the Times received a mailgram sent from Huntsville, Alabama, advising them that Cofield was alive and demanding compensation for the mental anguish the false obituary had caused him and his family. Cofield then sent a memorandum to the Times informing it that he was associated with a detective agency.
 
 
 3
 After more exchanges of correspondence, Cofield offered to settle the whole matter without litigation for $150,000. A follow-up mailgram on March 16, 1989, threatened the paper that if it did not settle immediately, Cofield would increase his settlement request $10,000 each day until a settlement was reached. Cofield then sued the Times for $100 million dollars. The defendant threatened the Times's attorneys with disciplinary proceedings if they did not settle the case and also added them as defendants in the defamation suit. The district court dismissed the suit with prejudice on summary judgment. The Times spent $20,000 fighting Cofield's litigation scam.
 
 
 4
 An FBI investigation revealed that Cofield had been incarcerated in Alabama state prisons since November 23, 1982. Cofield had nevert been married and had no children. While in prison, Cofield spoke to some college students in the spring of 1990 and bragged to them about his general obituary scheme, though he did not specifically mention the Times.
 
 
 5
 On August 31, 1990, after the civil suit against the Times had been dismissed, the FBI interviewed Cofield at the West Jefferson Correctional Facility. Two FBI agents asked if they could meet with Cofield. He agreed and was brought to the Assistant Warden's office. The government maintains that even though the agents didn't think they were required to read the defendant his Miranda rights because the interview was voluntary, they began to do so anyway. However, the defendant interrupted and stopped them, saying that he knew his rights, as he had legal training.
 
 
 6
 During this interview, Cofield stated that on or about February 1, 1989, he spoke with his friend, Marcus Thomas, from Jonesboro, Georgia, who asked Cofield, "Keenan, isn't it about time for you to die again?" Thomas later advised Cofield that he had researched the Times regarding, among other things, its financial health and legal representation. Cofield admitted to the officers that he had arranged for a friend to place the obituary in the Times and that he then proceeded to bring the lawsuit. Cofield also acknowledged that he had contacted the Times about his intentions to sue them. In addition, Cofield admitted to having filed 150-200 similar lawsuits, 95% of which were scams for profit. These included suits against newspapers in Selma and Tuscaloosa, Alabama and Atlanta, Georgia. All of these statements were written down by the FBI agent. A second draft of Cofield's statements was prepared because the agent had forgotten to include Cofield's acknowledgment that: I am "not under arrest on any federal charges and I'm free to discontinue this interview at anytime." Cofield initialed each page and signed the statement.
 
 II
 
 7
 Before Cofield's trial began, he filed a motion to suppress the interview with the FBI agents, claiming that he had never received his Miranda warnings. The district judge allowed the confessions into evidence, finding that the defendant had been given his Miranda warnings. On appeal, defendant argues that he never received such warnings and therefore his testimony should have been excluded.
 
 
 8
 The issue before us is whether Cofield was wrongly denied his Miranda rights. On appeal, the government concedes that, in fact, the defendant did not receive a complete reading of his Miranda rights. However, the government argues that Miranda warnings were unnecessary because Cofield was not in custody and Miranda warnings do not apply to noncustodial interrogation.
 
 
 9
 "Custodial interrogation" is typically defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The inquiry is whether there is "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." United States v. Conley, 779 F.2d 970, 972 (4th Cir.1985) (citations omitted), cert. denied, 479 U.S. 830 (1986). Custodial interrogation is found to have occurred if a reasonable person would have believed he could not leave freely. Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir.1978).
 
 
 10
 However, the "freedom of movement" or "free to leave" standard is not a useful tool to evaluate prisoner interrogation situations. No reasonable prisoner ever feels completely free to leave, as prisoners are placed in prison for the very purpose of preventing them from leaving. Applying the "free to leave" standard in a prison setting would create the illogical result of entitling a prisoner to Miranda warnings merely because of his status as a prisoner. Thus, a prisoner would have greater Miranda protection than a nonprisoner. See Cervantes, 589 F.2d at 428; Conley, 779 F.2d at 972-73. Courts have rejected this anomolous result and instead adopted the "restriction of movement" standard for prison interrogation situations.
 
 
 11
 In the prison situation, this necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.
 
 
 12
 Cervantes, 589 F.2d at 428.
 
 
 13
 As with the "freedom of movement" test for custody, the courts have applied an objective, "reasonable person," standard to determine if restriction of movement has occurred in prison settings. United States v. Phillip, 948 F.2d 241 (6th Cir.1991). Under Cervantes, this standard includes the following four factors:
 
 
 14
 ... the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting. Such a situation requires Miranda warnings.
 
 
 15
 Cervantes, 589 F.2d at 428.
 
 
 16
 In arguing that his interview with the FBI agents constituted a custodial interrogation requiring Miranda warnings, Cofield points to the following facts: 1) he was ordered from his cell to the Assistant Warden's office; 2) he was escorted to the interview by the Assistant Warden; and 3) he was placed in the office with the FBI agents and the door was shut. Defendant argues that these were not ordinary occurrences within the prison, all of which indicates that he was in a restrictive setting.
 
 
 17
 However, location is only one of the factors to be weighed. Defendant was informed that the interview was voluntary and he could end the interview at any time. He was also told that he had the right to counsel, that he was not in federal custody, and that the agents did not plan on arresting him. Defendant's signed statement confirms most of these facts. In addition, there appears to be no element of coercion. The FBI agent described the interview as a "discussion", the atmosphere as "very relaxed," and noted that the defendant even helped draft the statement.
 
 
 18
 While this court is inclined to find that this was not a custodial setting requiring Miranda warnings, we do not have to reach the custodial issue to decide this case. Instead, we hold that even if the defendant was in custody, he knowingly, intelligently, and voluntarily waived his right to receive Miranda warnings.
 
 
 19
 Miranda warnings serve to protect the fifth amendment guarantee that a defendant may not be compelled to be a witness against himself in any respect. Colorado v. Spring, 479 U.S. 564, 574 (1987). Whether or not an individual has waived his Miranda rights is determined by the "totality of the circumstances surrounding the interrogation" and whether these "reveal both an uncoerced choice and the requisite level of comprehension...." Id. at 573 (citations omitted).
 
 
 20
 A confession is deemed voluntary absent evidence that the defendant's "will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct." Id. at 574 (citations omitted). The voluntariness of a waiver is reviewed de novo. Derrick v. Peterson, 924 F.2d 813, 822 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 161 (1991). As mentioned in our custody discussion, we find no evidence of coercion or that Cofield's self-determination was critically impaired.
 
 
 21
 Whether a waiver of Miranda rights is knowingly and intelligently made is based on
 
 
 22
 ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The Miranda warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege ...
 
 
 23
 Colorado v. Spring, 479 U.S. at 574. This case is somewhat unique, in that it does not fit into the typical Miranda paradigms where 1) the defendant has been read his rights and the issue on appeal is whether or not he understood those rights, or 2) the defendant was never read his Miranda rights at all. See United States v. Espinosa-Orlando, 704 F.2d 507 (11th Cir.1983) (incomplete warning that omitted right to appointed counsel held insufficient to establish knowing waiver of rights) and United States v. Longbehn, 850 F.2d 450 (8th Cir.1988) (held that not reading Miranda rights to policeman was unconstitutional because the Miranda requirement is not contingent upon the defendant's actual or presumed knowledge).
 
 
 24
 Here, it is conceded that Cofield never had his Miranda rights fully read to him. When the agents began reading Cofield his rights, he interrupted them, made them stop, and told them that he knew the law. Cofield received a partial reading and was informed that he had right to counsel, was not under federal custody and was not going to be arrested. Given the totality of the circumstances, including Cofield's past criminal record and proud reputation of being one of the best jailhouse lawyers in Alabama, we find this case more analogous to situations where a defendant been read his full Miranda rights and then waives them. By his own affirmative act, Cofield conceded that he knew his rights. Nothing in the record impells us to quarrel with him. We hold that Cofield knowingly and intelligently waived his Miranda rights.
 
 III
 
 25
 Defendant also argues that insufficient evidence exists to sustain his conviction. The specific wire fraud violation charged against Cofield related to the sending of the February 14, 1989 mailgram to the Times. However, defendant argues that there is no proof that he mailed the mailgram, and that, in fact, it was impossible for him to send it, as it was postmarked from Huntsville, Alabama, while he was incarcerated in Birmingham, Alabama.
 
 
 26
 Sufficiency of the evidence is reviewed de novo. The standard is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979).
 
 
 27
 However, given the admissibility of Cofield's confession to the FBI agents, we hold that a rational trier of fact could certainly have found the essential elements of the crime beyond a reasonable doubt. "The mail fraud statute requires the establishment of but two elements: '1) a scheme to defraud, and 2) the mailing of a letter, etc., for the purpose of executing the scheme.' " United States v. Azad, 809 F.2d 291, 295 (6th Cir.1986) (citations omitted), cert. denied, 481 U.S. 1004 (1987). The defendant admitted to the FBI that he and a friend had concocted the scam and the jury clearly could infer that the accomplice sent the mailgram for him in furtherance of the scheme. Further, as argued by the government, it doesn't matter who sent the transmission as it was obviously in furtherance of the scheme. That is all the government needed to prove.
 
 
 28
 Cofield also argues that he was prejudiced by the introduction of testimony of Chris Shepard, a student at Cumberland Law School. As part of a criminal justice course, Shepard visited the West Jefferson Correctional Facility and heard Cofield speak. Shepard's testimony concerned statements Cofield allegedly made concerning his involvement in previous obituary scams. Prior to trial, defendant filed a motion to suppress this information regarding Cofield's prior scams and this motion was granted by the district court.
 
 
 29
 Despite this motion, defendant argues that the government introduced this evidence, over objections of defense counsel, at trial. The government asked Shepard: "Did Mr. Cofield say anything about obituaries during the course of his discussion with your class?" Defense counsel objected because this question was not limited to the one Chattanooga Times scam. The testimony in response concerned Cofield's tactics in his scam cases in general. No curative instruction was given to the jury. Defendant argues that this evidence was highly prejudicial to himself and went against the court's earlier ruling.
 
 
 30
 However, under Rule 401, Fed.R.Evid., the district court has broad discretion to admit relevant evidence. To show that this evidence was improperly admitted, the defendant must show abuse of discretion and the reviewing court must view the evidence in the light most favorable to the government, maximizing its probative value and minimizing it prejudicial effect. United States v. Brady, 595 F.2d 359, 361 (6th Cir.), cert. denied, 444 U.S. 862 (1979). This testimony was given with respect to the Times scam and, despite the defendant's contentions, it is not clear that this testimony related to earlier scams. Viewing the testimony in the light most favorable to the prosecution, we find the district court did not abuse its discretion in admitting the testimony.
 
 IV
 
 31
 The district court sentenced Cofield to 60 months' incarceration, the maximum sentence under the statute, and ordered him to pay $20,000 in restitution. Cofield argues that the district court's determination of his criminal history level as Category V was erroneous because the court wrongly included several invalid state court judgments. Under Rule 8, Alabama Rules of Civil Procedure, in order for a judgment to be valid it must be signed by the judge who imposes the judgment. Defendant argues that four of the state judgments against him were not signed, and three cases had no written judgments at all. However, the defendant does not claim he is innocent of these offenses or that they are constitutionally invalid. Rather, he claims they are invalid because of technical deficiences. Application note 6, U.S.S.G. § 4A1.2, provides only that a federal court will not consider convictions that have been reversed or vacated.
 
 
 32
 None of the convictions relied upon by the district court have been reversed. Defendant bears the burden of proving that his earlier convictions are invalid. United States v. Bradley, 922 F.2d 1290, 1297 (6th Cir.1991). The government argues, and we hold, that the defendant has offered no proof that the prior judgments were invalid by reason of not being signed. In fact, the copies presented to the court indicated that the judgments were signed by the judge, though the copies presented to the court did not have the signature.
 
 
 33
 Whether or not the underlying convictions are technically invalid, the district court could have departed upward under U.S.S.G. § 4A1.3, which permits an upward departure based on the use of prior sentences not used to compute criminal history category if there is "reliable information" that the criminal history category inadequately reflects the defendant's past criminal conduct." United States v. Osborne, 948 F.2d 210 (6th Cir.1991). The sentencing hearing indicates that the defendant had admitted his guilt to at least one of these convictions in a earlier state court proceeding and the defendant does not dispute the criminal conduct underlying these convictions.
 
 
 34
 Cofield also argues that the district court miscalculated his offense level by adding an additional two points to his base offense level, based on the offense involving more than minimal planning. U.S.S.G. § 2F1.1(b)(2). " 'More than minimal planning' means more planning than is typical for commission of the offense in simple form." U.S.S.G. § 1B1.1(f).
 
 
 35
 Cofield maintains that his efforts were no more than is typical for the commission of a mail fraud offense and that there was no evidence of repeated acts or efforts to conceal the offense. However, Cofield did more than file a random lawsuit. Instead, he researched to find an appropriate victim, sent numerous communications, and even threatened the Times's attorneys. A finding of more than minimal planning under these facts is not clearly erroneous.
 
 
 36
 The district court also added two points to Cofield's offense level based on his status as a leader, under U.S.S.G. § 3B1.1(c). In order to trigger the application of this sentencing guideline section, a defendant must be found to have led or organized other criminally responsible individuals. United States v. DeCicco, 899 F.2d 1531 (7th Cir.1990). Given the help that his friend Thomas gave Cofield in carrying out Cofield's scam, we find the district court's determination that Cofield was a leader not clearly erroneous.
 
 
 37
 The court found Cofield's sentencing guideline range was from 33 to 41 months. However, the court departed upward under U.S.S.G. § 2F1.1, because it concluded that Cofield's scam efforts had caused "a loss of confidence in an important institution, namely the judiciary." To justify upward departure, all that is required is that the district court "must offer reasons explaining why the departure is justified in terms of the policies underlying the sentencing guidelines." United States v. Cantu-Dominguez, 898 F.2d 968, 970 (6th Cir.1990) (citation omitted).
 
 
 38
 In reviewing departures, this court employes a three-step test. United States v. Joan, 883 F.2d 491, 494-96 (6th Cir.1989). The first is a question of law, whether the circumstances of the case are sufficiently unusual to justify departure. The second is a determination of whether there is a factual basis justifying departure, reviewed under the clearly erroneous standard. The third is whether departure is reasonable, and the trial court's initial determination must be given great deference. United States v. Joan, 883 F.2d at 494.
 
 
 39
 The guidelines permit an upward departure in situations where that the dollar loss did not fully capture the harmfulness and seriousness of the conduct." Application note 9, U.S.S.G. § 2F.1.1. Such situations include ones where "the offense caused a loss of confidence in an important institution." Application note 10(e), U.S.S.G. § 2F1.1.
 
 
 40
 Factually, the district court seemed to be greatly affected by the defendant's continued misuse of the judicial system. Additionally, the defendant bragged to college students about his scams abusing the system and the district court was not clearly erroneous in finding loss of confidence in the judicial system, as arguably nothing can be more detrimental to the judiciary than using the court system for extortion.
 
 
 41
 For all the reasons stated above, we AFFIRM the conviction and sentencing of the defendant.