[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10561
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cr-20725-RNS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MISAEL RODRIGUEZ PEREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 9, 2020)

Before MARTIN, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Misael Rodriguez Perez appeals his convictions for possession of 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and for aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  On appeal, he argues that the district court erred in denying his motion to suppress evidence obtained from a warrantless search of his truck because the search was neither a search incident to arrest nor voluntary.  Second, he argues that the district court abused its discretion in failing to apply a standard of manifest necessity before allowing the government to introduce the testimony of a late-disclosed witness.  For the reasons that follow, we affirm on both issues.

## I. BACKGROUND

On October 27, 2016, Detectives Yunieski Arriola and Brandon Ashe, of the Miami-Dade Police Department, while patrolling in an unmarked car, noticed ten trucks, many of which had fuel bladders in their beds, fueling up at a gas station.  Because they knew that fuel bladders were illegal in Florida, they entered the gas station.  As they did so, they noticed that one of the men fueling his truck, later identified as Yuniet Fuentes, had a firearm in his pocket.

The detectives parked their car and turned on their lights to alert the men to their presence and to avoid a confrontation.  Six of the trucks immediately fled.  The detectives detained and handcuffed the four men who remained at the gas station—Fuentes, Yenier Martell Rodriguez, Yunier Rodriguez Rivero, and

2

Rodriguez Perez.  Before being detained, Fuentes tossed a small brown bag into a grassy area.  The officers recovered it; it contained gift cards.  Because none of the men spoke English, Detective Arriola asked each of the men, in Spanish, if they consented to searches of their trucks, but he did not mention that they had the right to decline the search.  All four men responded affirmatively in Spanish.

The detectives then conducted searches of the trucks.  In Rodriguez Perez's truck, Detective Arriola found 16 gift cards.  At this point, he called Detective Alberto Roque, who worked in the police department's economic crime bureau.  Roque advised Arriola that he was working on a case involving the detainees and requested that the detectives seize the gift cards and release the men so as to not alert them to the nature of his investigation.

As he explained it at the subsequent suppression hearing, Roque's investigation involved the use of stolen credit cards to illegally purchase fuel, which was then resold for profit.  The conspirators would obtain credit card information—either by ordering credit cards off of the "black web" or by skimming credit card numbers off gas pumps and making their own credit cards with the stolen information—and then purchase gas.  They outfitted their trucks with both legal and illegal gas bladders, some of which could hold up to 1,000 gallons of fuel, and purchased fuel using the stolen credit card information.  Then they sold the stolen fuel to third-party buyers.

3

Rodriguez Perez was indicted nearly two years later, on September 6, 2018, with one count of possession of fifteen or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and with three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  The government sought to use the fruits of the October 27, 2016, search of Rodriguez Perez's vehicle, to which he objected by filing a motion to suppress.  Accordingly, the district court conducted a suppression hearing.  The district court ultimately denied Rodriguez Perez's motion to suppress, concluding that the government had the authority to conduct the search because it had probable cause, because it was a search incident to arrest, or because Rodriguez Perez consented to the search.

The case proceeded to trial, with jury selection scheduled for November 13, 2018, and opening arguments scheduled for November 14, 2018.  Both sides filed witness lists on November 9, 2018, pursuant to the district court's directive.  On November 13, after jury selection had been completed, the government filed an amended witness list, which included Yunier Rodriguez Rivero, who had been detained along with Rodriguez Perez at the gas station.  The government had received a call on the night of November 13 from Rodriguez Rivero's counsel advising the government that their client would be willing to testify.  The government immediately informed Rodriguez Perez's counsel.

4

The next morning, prior to opening statements, the district court heard argument on Rodriguez Perez's motion to exclude the testimony because of the government's late disclosure.  The government stated the circumstances of the late disclosure, and stated that it anticipated that the testimony would establish that Rodriguez Rivero knew Rodriguez Perez and that they were involved in a scheme of using fraudulent credit card numbers to purchase fuel and then resell it. Rodriguez Perez argued that the late disclosure of a cooperating witness severely prejudiced him because he was unsure of what Rodriguez Rivero's testimony would be and that it had changed the landscape of the trial.  The district court reserved ruling on the motion and invited Rodriguez Perez to raise the issue again if the government actually called Rodriguez Rivero as a witness.

During trial, the government informed the district court that it intended to call Rodriguez Rivero, who would testify that he was involved in a criminal scheme with Rodriguez Perez to use stolen credit card information to illegally purchase fuel that they would then resell to a buyer.  Rodriguez Perez again objected to his testimony, arguing that the new testimony morphed the case from one dependent on "very circumstantial evidence" to one with a direct witness—in other words, it changed the nature of the case that the jury had been empaneled for. Although the district court acknowledged that Rodriguez Rivero's testimony "eviscerated" Rodriguez Perez's "entire strategy," it ultimately allowed him to

5

testify—but only if he "testif[ied] about everything" and waived his Fifth Amendment rights.

Rodriguez Rivero ended up testifying as the government indicated he would—that he was involved in a conspiracy with Rodriguez Perez to illegally purchase and then resell fuel for profit. He testified that on October 27, 2016, the police approached and detained him and three of his co-conspirators, including Rodriguez Perez. He said that one of the officers asked him in Spanish if he could search his vehicle and though he wasn't sure if the officer asked the other men the same, he saw the officer approach and speak to the other men in Spanish. On cross-examination, he was asked about two subsequent arrests in March 2017 and August 2018 on similar charges. Following the testimony, Rodriguez Perez moved to strike Rodriguez Rivero's testimony, but the district court denied the motion. The jury ultimately returned a guilty verdict on all counts. Rodriguez Perez moved for a new trial and renewed his motion for a mistrial, citing the late introduction of Rodriguez Rivero. At the sentencing hearing, the district court entertained arguments for a new trial, ultimately rejecting them and sentencing Rodriguez Perez to a 27-month term of imprisonment followed by 3 years of supervised release. Rodriguez Perez timely appealed to us.

## II. LEGALITY OF THE SEARCH

First, Perez argues that the district court erred in denying his motion to suppress the evidence found in his truck. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In most circumstances, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). "[T]he basic rule [is] that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quotation marks omitted). Evidence that derives from an unlawful search is barred from use at trial as fruit of the illegality. Wong Sun v. United States, 371 U.S. 471, 485 (1963).

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "Voluntariness is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis that is based on the totality of the circumstances." Spivey, 861 F.3d at 1212 (quotation marks omitted). Generally speaking, "[i]n order for

consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360. In making the determination that the consent was voluntary, we must analyze the facts and balance the suspect's right to be free from coercive treatment with the needs of the government to conduct legal searches. Id. We have stated that the following are relevant, non-dispositive factors in determining voluntariness:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

Chemaly, 741 F.2d at 1352. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Thus, the government is not required to prove that the suspect was aware of the right to refuse to consent. Chemaly, 741 F.2d at 1353.

We review a district court's ruling on a motion to suppress under a mixed standard, reviewing the district court's findings of fact for clear error and its application of the law to those facts *de novo*. United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). "[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party

8

below." Id.  When reviewing the district court's decision, we may consider any evidence presented at trial and are not limited to the evidence introduced at the suppression hearing.  United States v. Villabona-Garnica, 63 F.3d 1051, 1056 (11th Cir. 1995).  Additionally, we review the district court's determination that a defendant's consent to a search was voluntary for clear error.  United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984), opinion reinstated on reh'g sub nom. United States v. Bacca-Beltran, 764 F.2d 747 (11th Cir. 1985).  We "will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred."  United States v. Spivey, 861 F.3d 1207, 1212 (11th Cir. 2017), cert. denied, 138 S. Ct. 2620, 201 (2018) (quotation marks omitted).

The district court did not err in finding the search lawful under the Fourth Amendment.  We conclude that its determination that Rodriguez Perez consented to the search is supported by the record and does not constitute clear error.  We need not reach the district court's conclusion that the search was permissible because the police had probable cause or because it was a search incident to arrest. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1059 (11th Cir. 2007) ("[W]e may . . affirm a district court's decision to grant or deny a motion for any reason[.]").

9

Construing all facts in the light most favorable to the party prevailing below, we conclude that the district court could have reasonably concluded that Rodriguez Perez consented to the search. First, Detective Arriola's testimony that he sought, and received permission from, Rodriguez Perez while he was detained was not contradicted at the suppression hearing or at trial. Second, we reject Rodriguez Perez's argument that his consent was not voluntary based on a totality of the circumstances. Here, we find two of our past cases—Espinosa-Orlando and Garcia—instructive.

In United States v. Espinosa-Orlando, four law enforcement agents conducted a traffic stop of Espinosa and his brother, and with weapons drawn, asked them to exit the vehicle, patted them down for weapons, and instructed them to lie on the grass. 704 F.2d 507, 510 (11th Cir. 1983). One of the agents asked Espinosa in a conversational tone, while he was still lying on the grass, whether he gave permission to search the vehicle, which he did. Id. at 510. While Espinosa was asked for permission to search, three of the agents had reholstered their weapons and the fourth had his weapon pointed at the ground. Id. at 513. We determined that the district court correctly found that the consent was voluntary, noting that "no abusive language or physical threats were at any time directed at Espinosa, who had not been handcuffed, placed within a police vehicle, or transported away from the location of the stop." Id.

10

Similarly, in United States v. Garcia, agents arrested Garcia in his front yard with 14 agents present.  890 F.2d at 360.  After being searched for weapons, Garcia led the agent who performed the arrest and the search into his home to show him where his weapons were located.  Id.  Garcia was placed on the couch in his living room, read his Miranda[1] rights in Spanish, and asked for his consent to search in Spanish.  Id. at 360-61.  Garcia consented to a limited search only, but the agents refused the limited consent, requested his consent to search the entire home, and stated that, if he did not consent, they would secure the house and apply for a search warrant.  Id. at 361.  Garcia then told the agents to go ahead and search the house.  Id.  The district court found that Garcia's consent could not have been voluntary, but we reversed.  Id.  We pointed to cases that presented much more coercive encounters between law enforcement and defendants, like Espinosa-Orlando.  Id.  We recognized that the number of agents involved was greater than that in Espinosa-Orlando and that Espinosa had not been handcuffed like Garcia, and we conceded that these "factors indicate[d] that Garcia was under some pressure to comply with the agents' request."  Id. at 362.  However, we concluded that there was no evidence that the "officers employed any tactics that would augment the degree of coercion that is inherent in any arrest," and considering the totality of the circumstances, the consent was voluntary.  Id.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

11

Here, based on the totality of the circumstances, we conclude that Rodriguez Perez's consent to the search was voluntary. At the time that Detective Arriola asked for permission to search the truck, there is no clear evidence that either he or Detective Ashe had drawn their weapons. There is also no evidence that either officer threatened any of the men or attempted to coerce them. While we acknowledge that the context of the search was somewhat pressured—the men were detained at a gas station, placed in handcuffs, and apparently did not speak English—we cannot conclude, based on our past precedent in Espinosa-Orlando and Garcia, that Rodriguez Perez's consent was involuntary. Accordingly, we conclude that the district court did not err in finding the search lawful under the Fourth Amendment and affirm as to this ground.

### III. RODRIGUEZ RIVERO'S TESTIMONY

Next, Rodriguez Perez argues that the district court erred in allowing the government to introduce the testimony of a critical cooperating witness who was disclosed the night before opening arguments were scheduled to commence without a showing of manifest necessity by the government. We note at the outset that Rodriguez Perez's specific argument here is not overwhelmingly clear. He does not appear to argue that the district court erred in denying his motions for a mistrial or a new trial, thereby abandoning those arguments. United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). He also does not properly

12

address his argument that the government violated his rights to a fair trial, effective assistance of counsel, confrontation through cross examination, and due process of law, leading us to conclude that those arguments are abandoned, as well. See id. Moreover, Rodriguez Perez clarifies that he is not challenging the government's failure to provide a witness list or use of an undisclosed witness at trial. The only argument that we are able to clearly discern is that the district court should have applied a "manifest necessity" requirement to the government's attempt to introduce a late-disclosed witness.

The "manifest necessity" requirement is derived from the Supreme Court's caselaw concerning the intersection of mistrials and the Double Jeopardy Clause. Generally, retrials following mistrials do not violate the Double Jeopardy Clause so long as the grant of a mistrial is because of "manifest necessity." Richardson v. United States, 468 U.S. 317, 323–24 (1984). Under this standard, "district courts are permitted to declare a mistrial and discharge a jury only where, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." United States v. Therve, 764 F.3d 1293, 1298 (11th Cir. 2014).

We decline Rodriguez Perez's invitation to apply the "manifest necessity" standard in a context like his—in which the government belatedly attempts to introduce the testimony of a cooperating witness. We conceptualize Rodriguez

13

Perez's argument as essentially arguing that the district court made an incorrect evidentiary ruling, which we review for abuse of discretion. United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007). Given that we have never applied the "manifest necessity" standard outside of the Double Jeopardy Clause–mistrial context, we do not believe that the district court abused its discretion by failing to apply it here.

But even if we read Rodriguez Perez's argument as implying that his substantial rights were violated, we would nonetheless affirm the district court's decision. "Late disclosure of evidence required to be turned over under [Federal Rule of Criminal Procedure] 16 or a standing discovery order necessitates reversal only if it violates a defendant's substantial rights." United States v. Bueno-Sierra, 99 F.3d 375, 380 (11th Cir. 1996). "Substantial prejudice is established when the defendant shows that he was unduly surprised and did not have an adequate opportunity to prepare a defense or that the mistake had a substantial influence on the jury." United States v. Rivera, 944 F.2d 1563, 1566 (11th Cir. 1991). We have previously determined that a defendant established substantial prejudice where the testimony of the late-disclosed witness "shattered" his defense. United States v. Camargo-Vergara, 57 F.3d 993, 998–99 (11th Cir. 1995). However, we have concluded that there is no substantial prejudice when the defendant should have known that a late disclosed statement existed and there was substantial other

14

evidence linking the defendant to the offense. United States v. Rivera, 944 F.2d 1563, 1566–67 (11th Cir. 1991). We review the district court's evidentiary decisions for abuse of discretion. Perez-Oliveros, 479 F.3d at 783.

In this light, we cannot conclude that the district court abused its discretion. While we have no doubt that the late introduction of Rodriguez Rivero's testimony adversely affected Rodriguez Perez's defense, we do not believe that it "shattered" his defense. Instead, we find it plausible that Rodriguez Perez should have known that Rodriguez Rivero—or one of the other two men who was detained at the same time that they both were—might testify against him. All four men were engaged in the same criminal actions, were all detained at the same time by Officers Arriola and Ashe, and all had evidence connecting them to the crime. Moreover, the government informed the district court that it disclosed to Rodriguez Perez's counsel in September 2018 the information it had related to Rodriguez Rivero, including the fact that he had been indicted along with Rodriguez Perez. In other words, Rodriguez Perez either knew or should have known that substantial other evidence was lurking in the ether.

Accordingly, we affirm as to this issue. Rodriguez Perez cannot demonstrate that the district court's failure to apply the "manifest necessity" standard constituted abuse of discretion. And even if we address the potentially abandoned argument that Rodriguez Perez suffered substantial prejudice because

15

of Rodriguez Rivero's late testimony, we similarly do not think that the district court abused its discretion.

**AFFIRMED.**