**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Juan Jose GARCIA, Defendant–Appellee.**

**No. 88–6276.**

United States Court of Appeals, Eleventh Circuit.

Dec. 11, 1989.

Commissioner denied Pearson due process under the fifth amendment.

Dexter W. Lehtinen, U.S. Atty., Dawn Bowen, and Linda C. Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

Michael O'Kane, Ft. Lauderdale, Fla., for defendant-appellee.

Before FAY and KRAVITCH, Circuit Judges, and CASTAGNA *, District Judge.

FAY, Circuit Judge:

The United States appeals the district court's ruling in favor of suppressing physical evidence discovered at the residence of defendant Juan Garcia. The court held that the consent which Garcia gave government agents to search his house was not given freely, voluntarily, and knowledgeably because of the circumstances existing

* Honorable William J. Castagna, U.S. District Judge for the Middle District of Florida, sitting by designation.

at the time the consent was given. The government argues that the conditions present when Garcia consented to the search were not inherently coercive, and therefore Garcia's consent was in fact voluntary. We agree with the government. Accordingly, we REVERSE the district court's order granting defendant's motion to suppress and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

In 1988, Juan Garcia was under investigation for his involvement in cocaine and counterfeiting operations. As a result of information received from a confidential informant, federal authorities suspected that Garcia was linked to the importation of a substantial amount of cocaine, had arranged for the sale of counterfeit currency, and had agreed to sell 10 kilograms of cocaine. The Drug Enforcement Administration (DEA), which was conducting the investigation of Garcia's connection with narcotics, consolidated its efforts with the Secret Service, which was investigating the counterfeiting operation, in an attempt to make the investigations more effective.

On April 19, 1988, the Secret Service arrested a number of Garcia's associates when they delivered counterfeit currency to the confidential informant. Although Garcia was implicated in the counterfeiting scheme, he was not immediately arrested because he was not present when the delivery took place and because the Secret Service knew of the pending narcotics investigation. The Secret Service obtained a warrant for Garcia's arrest on April 20, 1988.

During the Secret Service's investigation of the counterfeiting operations, the confidential informant, under the direction of the DEA, was arranging a purchase of approximately ten kilograms of cocaine from Garcia. An individual named "Flaco" was to deliver the cocaine to Garcia so that Garcia could sell it to the informant. However, since many of Garcia's associates were arrested on counterfeiting charges on April 19, and the informant was not one of those arrested, DEA agent Gravat became concerned for the safety of the informant and on April 20, instructed the informant to cease contact with Garcia until he received further instructions.

On April 21, 1988, agent Gravat directed the informant to contact Garcia to arrange for the purchase of half of the ten kilograms of cocaine at a fast food restaurant. Gravat had previously convened with Secret Service agents and established surveillance at Garcia's residence. At approximately 11:45 a.m., Gravat received a telephone call from the informant who explained that Garcia was in possession of the cocaine at his house, and that Garcia desired that the transaction take place at his residence rather than the fast food restaurant. Gravat conferred with the other Secret Service and DEA agents participating in the surveillance regarding whether it would be safe to enter Garcia's residence to execute the arrest, as the agents had been apprised of the fact that Garcia frequently carried weapons. The agents also feared that "Flaco," the person who was to deliver the cocaine, was still in the house.

In the midst of these discussions, the agents observed Garcia walk out of the house without his handbag, in which he normally carried his weapon. Garcia began conversing with a man named "Tico" over the front yard fence, and the agents decided that since Garcia was probably unarmed, it would be a good time to arrest him. Secret Service agent Trasollas arrested Garcia in the front yard while a number of other officials searched the house not for physical evidence, but to protect the exposed officers from anyone inside. The agents found no one in the house other than Garcia's elderly mother-in-law, who was visibly shaken. Agent Raffanello, the DEA agent in charge, requested one of the female officers to assist Garcia's mother-in-law and called the paramedics to attend to her in case her condition worsened.

During the security sweep, agent Trasollas was conducting a "pat-down" search of Garcia, and asked Garcia if he had any weapons. Garcia answered affirmatively and led Trasollas into the house to show him the location of the weapons. Trasollas accompanied Garcia to the bedroom where

he found the guns and took possession of them. Trasollas then led Garcia from the bedroom to the living room and placed him on the couch, handcuffed.

Officer Diazlay of the Miami Police Department, acting as an interpreter, read Garcia his *Miranda* rights. After Garcia acknowledged that he understood his rights, DEA agent Raffanello directed Diazlay to request Garcia's consent to search the house for physical evidence. Diazlay complied, and Garcia responded that the officers could search only certain rooms, because he did not want the agents to see various personal items. Raffanello did not accept Garcia's conditional consent, and told Garcia, through Diazlay, that they would have to secure the house and attempt to obtain a search warrant.[1] Garcia responded that the agents need not procure a search warrant; they could "go ahead and search the house." (R2–119).

Pursuant to Garcia's statement, the agents began searching the house and found in Garcia's bedroom more than two kilograms of cocaine and various drug paraphernalia. On April 28, 1988, the grand jury charged Garcia with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841 (a)(1). Garcia filed a motion to suppress the physical evidence obtained during the search on the ground that his consent was involuntary. The trial court granted Garcia's motion to suppress. We review the district judge's decision.

## II. STANDARD OF REVIEW

Initially, we must determine under which standard to review the trial court's ruling that Garcia's consent to the search of his home was involuntary. In his order granting Garcia's motion to suppress evidence resulting from the allegedly unlawful search, the trial judge found as a matter of fact that Garcia's consent to the search was involuntary. In support of his conclusion, the judge stated in his findings of fact:

The defendant's consent given here, when viewed under the totality of the circumstances, cannot be deemed to have been given freely, voluntarily, and knowledgeably. In particular, the Court notes that fourteen armed officers were present, that the defendant was placed in handcuffs and was taken into his own home in the presence of his mother-in-law, that the defendant initially refused to give consent, and only after persistence by the officers was consent obtained. These factors, combined with all other evidence presented, necessitate a finding of unacceptable, involuntary consent.

(Supp.R. 4).

■ The Supreme Court has held that "[v]oluntariness is a question of fact to be determined from all the circumstances" when evaluating the validity of a consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–249, 93 S.Ct. 2041, 2058–2059, 36 L.Ed.2d 854 (1973). However, the Court has further admonished that when a claim disputing voluntariness is raised, "it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)). This circuit has assimilated these cases and determined that rulings on motions to suppress evidence involve mixed questions of law and fact. *United States v. Malekzadeh*, 855 F.2d 1492, 1496 (11th Cir.1988), *cert. denied sub nom. Shayanfar v. United States*, — U.S. —, 109 S.Ct. 1149, 103 L.Ed.2d 209 and *cert. denied* — U.S. —, 109 S.Ct. 1163, 103 L.Ed.2d 221 (1989); *United States v. Rioseco*, 845 F.2d 299, 302 (11th Cir.1988); *United States v. Alexander*, 835 F.2d 1406, 1408 (11th Cir.1988); *Jurek v. Estelle*, 623 F.2d 929, 932 (5th Cir.1980) (en banc)[2],

---

**1.** There were fourteen officials present at the time of Garcia's arrest, so it would not have been prohibitively onerous to secure the residence.

**2.** The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the

*cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Hence, while we must defer to the trial judge's findings of fact unless clearly erroneous, *United States v. Bulman,* 667 F.2d 1374, 1379 (11th Cir.) (per curiam), *cert. denied sub nom. Howard v. United States,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982), we are to review the district judge's application of law to the facts *de novo. United States v. Alexander,* 835 F.2d at 1408.

■ Normally, we will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred. *See United States v. Chemaly,* 741 F.2d 1346, 1352 (11th Cir.1984); *United States v. Alegria,* 721 F.2d 758, 761 (11th Cir.1983); *see also United States v. Edmondson,* 791 F.2d 1512, 1514–1515 (11th Cir.1986) (finding of fact clearly erroneous when reviewing court is left with definite and firm conviction that mistake was committed). However, this is true because the trial judge usually bases his finding on credibility choices resulting from conflicting testimony. Further, in making these choices, the trial judge routinely relies, at least to a certain extent, on the demeanor of witnesses—an experience which the appellate court does not share. Thus, because in the ordinary case a finding of voluntariness is based on credibility choices, we will not overturn the trial

judge's finding that defendant's consent was voluntary, unless it is clearly erroneous. *See United States v. Aldridge,* 719 F.2d 368, 373 (11th Cir.1983); *United States v. Waksal,* 709 F.2d 653, 656 n. 4 (11th Cir.1983).

■ This case, however, is not the ordinary case. Unlike most cases in which both parties introduce conflicting evidence on the issue of voluntariness, in this case defendant introduced no evidence to contradict the government's evidence regarding the circumstances under which Garcia's consent was obtained.[3] Evidence of the circumstances under which the agents elicited Garcia's consent was introduced solely by the government through its witnesses— DEA agent Gravat, DEA agent Raffenello, Miami Police Department Officer Diazlay, and Secret Service Agent Trasollas. Defendant did not testify. Thus, the trial court was compelled to rely only on the uncontradicted testimony of the government's witnesses.

This leads us to the conclusion that unless the trial judge doubted the credibility of any of the government's witnesses, his decision was based on the application of what he believed to be the existing law as applied to the uncontroverted facts. We can not conclude from the record that the district judge questioned the agents' accounts of the events that took place on April 21, 1988.[4] Accordingly, we believe

former Fifth Circuit rendered prior to October 1, 1981.

**3.** Defendant did present testimony which contradicted the government's account of the events taking place shortly before Garcia's arrest. For example, Garcia's mother-in-law and daughter testified that the agents who conducted the protective sweep ripped a hole in the screen door, and that the agents conducting the search for physical evidence ransacked the bedrooms. The agents testified, on the other hand, that they damaged neither the screen door nor the bedrooms. The district court stated that while the resolution of this conflict would require credibility choices, he need not resolve it because "the agents were justified in fact, and proceeded appropriately under law, in entering the house with the use of reasonable force." (Supp.R. 3). Thus, although defendant raised an issue of fact at the suppression hearing, the issue was not

pertinent to the issue of the voluntariness of defendant's consent.

**4.** The trial judge based his finding of involuntariness essentially on three facts. First, the judge found that fourteen armed officers were present. (Supp.R. 4). The only evidence which supported this finding was the testimony of agent Gravat (R2–27, 67). *See also* (R2–106, 107) (Agent Raffanello did not deny that fourteen agents were present when asked on cross-examination whether he "rounded up the fourteen agents."). Second, the court found that the defendant was placed in handcuffs and was taken into his house in front of his mother-in-law. (Supp.R. 4). Likewise, the agents' testimony corroborates this finding. (R2–38, 91, 115, 135, 139). Third, the court stated that the defendant initially refused to give consent, but eventually gave it only after the agents persisted. (Supp.R. 4). Again, the court derived its

that the trial court found as a matter of law, rather than fact, that because of what he perceived as inherently coercive conditions, Garcia's consent to the search could not have been voluntary.[5] Therefore, we will review the judge's finding of voluntariness *de novo* and determine whether under the circumstances described by the government's witnesses, Garcia's consent was voluntary.

## III. VOLUNTARINESS OF GARCIA'S CONSENT

 The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures by law enforcement authorities of the United States government. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) and *Coolidge v. New Hampshire*, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971)). One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043 (citing *Davis v. United States*, 328 U.S. 582, 593–594, 66 S.Ct. 1256, 1261–1262, 90 L.Ed. 1453 (1946) and *Zap v. United States*, 328 U.S. 624, 630, 66 S.Ct. 1277, 1280, 90 L.Ed. 1477 (1946)).

 In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and uncon-

strained choice. See *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229, 93 S.Ct. at 2048. However, "to place artificial restrictions upon such searches would jeopardize their basic validity." *Id.* Hence, in determining whether Garcia's consent was voluntary, we must scrutinize the facts, and strike a balance between Garcia's right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches. *See Id.* at 227, 93 S.Ct. at 2047.

 In striking this balance, we must review the undisputed facts which describe the circumstances under which Garcia consented to the search of his home and apply the law to those facts. The agents testified that they arrested Garcia in his front yard after establishing surveillance at his house on the morning of April 21, 1988. There were fourteen agents present during the arrest. (R2–27, 67). Fearful that other armed persons might be in the house, a group of the agents conducted what the district court characterized as a proper security sweep of Garcia's home. (Supp.R. 3). The agents found no one other than Garcia's mother-in-law in the house. *Id.* Agent Trasollas testified that after he arrested Garcia and searched him for weapons, Garcia led Trasollas into the house to show him the location of his weapons. (R2–136). Garcia was then placed on the couch in his living room and read in Spanish his *Miranda* rights by officer Diazlay.

conclusion from the testimony of the agents present when consent was requested. (R2–96, 96, 109, 110, 118, 119, 121, 122, 123, 140). Because the district court's findings of fact did not contradict, or even question the veracity of, the testimony of the agents, we must conclude that he did not doubt their credibility.

5. We reiterate that had the trial court been faced with conflicting testimony or had the trial court stated that the government's witnesses were incredible, the trial court would be afford-

ed substantial deference in resolving this issue. However, as the decision the district court made was based solely on the circumstances described through uncontradicted testimony of the agents whose credibility was unquestioned, we believe that we are in as good a position as the district court to apply the law to the uncontroverted facts. *See United States v. Rioseco*, 845 F.2d 299, 302 (11th Cir.1988) ("[W]e give plenary review to the application of law to the facts").

(Supp.R. 4). Officer Diazlay next requested a verbal consent in Spanish, and Garcia consented to only a limited search. *Id.* The agents refused this conditional consent and requested consent to search the entire premises or else they would have to secure the house and apply for a search warrant. *Id.* Diazlay testified that Garcia responded, "You can go ahead and search the house." (R2–119).

The trial court found that under these circumstances, Garcia's consent could not be considered voluntary. We disagree. This is not a case in which the consent was merely acquiescence to a claim of lawful authority. *Cf. Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The agents never represented to Garcia that they were in possession of a search warrant, or that they could lawfully search his premises without his consent. The agents merely stated that they would not accept Garcia's conditional consent, and that if he refused to consent to a full search, the agents would attempt to obtain a warrant. (Supp.R. 4). Further, defendant adduced no evidence indicating a lack of mental capacity to understand his actions.

There are cases within this circuit that have approved a finding of voluntariness when defendant was under far more coercive conditions than in the instant case. For example, in *United States v. Long,* 866 F.2d 402 (11th Cir.1989), an investigation of a tip that defendant was involved in a counterfeiting conspiracy led officers to defendant's home. The officers requested defendant's consent to search for counterfeit currency they suspected was buried in the yard, and stated that if he refused they would return and "dig the place up." *Id.* at 404. Defendant consented. The court held that defendant's consent was voluntary. The court opined, "Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion." *Id.* at 405.

If the *Long* court found the officers' statements that they could return and "dig the place up" to be uncoercive, then certainly we should find the agents' statements to Garcia equally unintimidating. The agents did not threaten, as did the officers in *Long,* that unless Garcia consented to the search, his home would be damaged upon the acquisition of a search warrant. The agents simply told Garcia that they would secure the house and attempt to obtain a search warrant if he refused consent. We find nothing in this statement which would indicate that the agents were trying to do anything more than lawfully request Garcia's permission to search.

Another case which supports our holding that Garcia's consent was voluntary is *United States v. Espinosa–Orlando,* 704 F.2d 507 (11th Cir.1983). In this case, federal agents, suspecting that defendant was transporting controlled substances in his car, arrested defendant near his automobile at gunpoint. The agents then forced defendant to lay on the grass near the roadway, and all but one agent reholstered their weapons. While defendant was lying on the ground, the agents requested defendant's permission to search his car. Defendant answered affirmatively. The court held that despite the fact that defendant was lying on the ground near the officials and that one agent on the scene still had his weapon drawn, albeit pointed elsewhere, defendant's consent to the search was voluntary and uncoerced.

*Espinosa–Orlando* clearly supports our finding of voluntariness in the instant case. The circumstances in which Garcia found himself were far less constraining than those present when Espinosa consented to the search of his automobile. Unlike Espinosa, who was lying on the ground near a road with four agents towering over him, Garcia was in his own living room seated on his sofa. The trial court indicated that the fact that Garcia was in his own living room exacerbated the coercive nature of the conditions at the time of the agents' request. (Supp.R. 4). It appears to us that the opposite is true. We submit that one would feel more comfortable and free from pressure when he is in his living room than when he is lying in the grass on the edge of the street.

We realize, however, that Garcia's circumstances differed from Espinosa's insofar as the number of agents in and around Garcia's home (fourteen) was far greater than the number of agents surrounding Espinosa (four), and insofar as Garcia was handcuffed while Espinosa was not. We concede that these factors indicate that Garcia was under some pressure to comply with the agents' request, but considering the totality of the circumstances, we cannot conclude that these factors caused Garcia's consent to become involuntary. The record does not manifest that all fourteen agents were in the living room while Garcia was being asked for his consent to the search. Consequently, although the trial judge found that there were fourteen agents "present," we will not assume that all were in the same room when Garcia consented. Further, there is simply no evidence that these officers employed any tactics that would augment the degree of coercion that is inherent in any arrest. *See United States v. Horton*, 488 F.2d 374, 381 (5th Cir.1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). Thus, while we understand that Garcia was nervous during the arrest[6], we do not believe that his nervousness resulted from extraordinary or unlawful police conduct.

Finally, the trial court seemed extremely concerned that Garcia initially gave conditional consent, "and only after persistence by the officers was [unconditional] consent obtained." (Supp.R. 4). We would agree with the trial court that in some cases persistence could lead to an involuntary confession. For instance, if the agents had requested Garcia's consent so many times that Garcia responded affirmatively in an effort to escape further harassment or as a result of frustration and exhaustion, then we would find the consent involuntary. However, this case presents a different scenario. Agent Raffanello testified at the suppression hearing that Garcia initially consented to a search of only certain rooms. (R2–96). Apparently, this was because he did not want the agents to find some personal items. (R2–119). Agent Raffanello then instructed officer Diazlay to inform Garcia that the agents would secure the house and attempt to procure a search warrant. (R2–96, 109, 110, 121, 122, 123).[7] Garcia responded that the agents could search the entire house. (R2–119, 123). There is no evidence to indicate that the officers were attempting to harass or intimidate Garcia. They did nothing more than once request Garcia's unlimited consent after receiving his qualified consent and informing him of his alternatives. Defendant adduced no evidence to indicate that the agents deprived him of a true choice to refuse consent. Thus, the fact that Garcia initially refused to allow an unlimited search does not in this case vitiate his later unconditional consent.

## IV. CONCLUSION

After careful review of the uncontroverted facts established in the record, we conclude that the conditions which existed at the time Garcia acknowledged his willingness to allow the agents to search his home do not support the trial judge's finding that consent could not have been voluntary.[8]

---

6. In fact, agent Trasollas testified that en route to the agency, Garcia told him that he had soiled his undergarments during the arrest. Agent Trasollas then returned to Garcia's home so that Garcia could exchange his undergarments.

7. We note that defendant intensely cross-examined officer Diazlay regarding whether Garcia was told that the agents would obtain a warrant or only attempt to obtain a warrant. Officer Diazlay testified that he informed Garcia that they would attempt to procure a warrant. (R2–121, 122). Hence, defendant can not argue that Garcia consented as a result of a claim of lawful authority to search. *Cf. Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968) (consent involuntary when officials requesting search mendaciously claim that they are in possession of a warrant).

8. We reemphasize that normally, we review issues regarding voluntariness of consent as questions of fact reversible only upon a showing of clear error. However, because defendant did not present evidence of Garcia's subjective state of mind and because the court did not question the credibility of the witnesses who described the circumstances, we must infer that the trial court found as a matter of law that the conditions existing at the time of Garcia's consent were such that he could not have given his consent voluntarily.

Accordingly, we REVERSE the district court's order granting defendant's motion to suppress and REMAND for further proceedings consistent with this opinion.