[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15156

_____

D. C. Docket No. 04-00474-CR-6-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SALVADOR VILLANUEVA-FABELA,
a.k.a. Chava,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 27, 2006)**

Before BLACK and HULL, Circuit Judges, and RYSKAMP,* District Judge.

---

*Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District
of Florida, sitting by designation.

PER CURIAM:

Defendant Salvador Villanueva-Fabela ("Villanueva-Fabela") appeals his drug and firearms convictions and sentences. On appeal, Villanueva-Fabela argues that the district court erred by (1) denying his motion to suppress evidence seized from his trailer home; and (2) enhancing his sentence based on his role in the offense. After oral argument and a thorough review of the record, we affirm.

## I. BACKGROUND

On August 8, 2003, Atlanta Police Department officers reported to a trailer park located at 501 Connell Avenue and surrounded trailer E-1 after receiving information that a suspect involved in a shooting was last seen entering that trailer. Because the suspect, later identified as Gilibaldo Villanueva-Fabela ("Gilibaldo"), had relatives who lived in trailer C-1, several officers also established a perimeter around trailer C-1 in order to look for the suspect.

While officers were standing outside of trailer E-1, Gilibaldo exited the trailer and stood on the front porch. The officers instructed Gilibaldo to stop and raise his hands. Gilibaldo started to raise his hands, but then lowered them and attempted to reach for his pants pocket. As a result, the officers approached Gilibaldo with their weapons drawn, demanding that he raise his hands. Gilibaldo complied and was placed in handcuffs. After noticing a bulge in Gilibaldo's pants

2

pocket, officers patted him down and discovered a loaded revolver and some ammunition.

At that time, two other individuals, later identified as Pedro Villanueva-Fabela ("Pedro") and Alexandro Plancarte ("Plancarte"), exited trailer E-1 and were searched. A pistol was recovered from Plancarte's pocket. The officers then conducted a security sweep inside trailer E-1 for their safety and observed in plain view a block of marijuana, a large amount of suspected methamphetamine, a set of scales, and several rifles. The officers secured the area while one of them left to obtain a search warrant.

Meanwhile, the officers stationed outside of trailer C-1 detected a strong odor of raw or bulk marijuana coming from the trailer. Because of this odor, the officers continued to investigate trailer C-1 even after Gilibaldo had been apprehended at trailer E-1. At some point, the officers approached Defendant Villanueva-Fabela, who was sitting on the front porch of trailer C-1, and placed him in handcuffs. Villanueva-Fabela's common-law wife, Norma Lopez, and their children also were present at the scene. Because neither Villanueva-Fabela nor Lopez understood English, Officer Medina, a Spanish speaking officer, was called to the scene in order to translate, inquire about the ownership of trailer C-1, and try to obtain consent to search the trailer. Officer Medina, who was wearing a full

3

uniform and badge but did not have his gun drawn, explained to the couple that the other officers wanted to look for drugs, weapons, and other contraband, and requested their consent to search.

Officer Medina also provided Defendant Villanueva-Fabela and Lopez with a consent-to-search form in Spanish, which he also read to them. As Officer Medina read the form, he asked Lopez and Defendant Villanueva-Fabela whether they understood what he was saying, and neither one of them expressed any misunderstanding or confusion. Officer Medina also explained that they had the right to refuse consent. Officer Medina indicated, however, that if they refused to give consent to search, the officers would obtain a search warrant for the premises. During this encounter, Defendant Villanueva-Fabela was not very talkative, but he did indicate that he understood the contents of the form by nodding and saying "yes" in Spanish when asked if he consented. Lopez wrote her name and Defendant Villanueva-Fabela's name on the top of the form. Villanueva-Fabela then signed the bottom of the consent form, but his signature was in the wrong space on the form.

Once the officers at trailer C-1 had obtained consent to search, they began to search trailer C-1. During the search, Officer Medina remained with Lopez and Defendant Villanueva-Fabela in case they decided to revoke their consent. With

4

the help of a canine unit, the officers located and seized approximately one pound of marijuana from underneath trailer C-1. The officers also found a sawed-off shotgun in a bedroom, as well as a few other firearms inside trailer C-1. Defendant Villanueva-Fabela was placed under arrest.

Back at trailer E-1, the officers began to search the trailer after successfully obtaining a search warrant. During the search of trailer E-1, the officers located and seized (1) a large block of compressed marijuana weighing approximately ten pounds; (2) 2,086 grams of methamphetamine; (3) a total of seventeen firearms, including a Mac-11 machine pistol; and (4) approximately $20,000 in U.S. currency. Gilibaldo, Pedro, and Plancarte were placed under arrest.

About a month later, Defendant Villanueva-Fabela, who had been released on bond following his August 8, 2003 arrest at trailer C-1, was placed under arrest on September 11, 2003, for federal charges stemming from his possession of a sawed-off shotgun. That same day, based on information received from Villanueva-Fabela's girlfriend, Ashley Ortiz, law enforcement officers conducted a search of a hotel room in which Villanueva-Fabela and Ortiz had been staying. During the search, the officers located and seized several items, including (1) 439.6 grams of methamphetamine; (2) approximately 50 tablets of 3,4 methylenedioxymethamphetamine (also known as "MDMA" or "ecstasy");

5

(3) a small amount of marijuana; and (4) approximately $20,000 in U.S. currency.

In September 2004, a federal grand jury returned a multiple count indictment against Defendant Villanueva-Fabela and various co-conspirators. The indictment charged Defendant Villanueva-Fabela with (1) conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii) (Count One); (2) conspiracy to possess firearms, including a Mac-11 machine pistol and a Jennings chrome 9mm handgun, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1) and 371 (Count Two); (3) possession of a firearm, specifically the Mac-11 machine pistol described in Count Two, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(B)(ii) and 2 (Count Seven); (4) possession with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. § 2 (Count Eight); (5) possession with intent to distribute a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count Nine); (6) possession of an unregistered firearm, specifically a shotgun with a barrel less than 18 inches in length, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Twelve); (7) possession

6

of a firearm by an illegal alien, specifically the shotgun described in Count Twelve, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) (Count Thirteen); (8) possession of a firearm, specifically the Jennings chrome 9mm handgun described in Count Two, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count Fourteen); (9) possession with intent to distribute at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) and 18 U.S.C. § 2 (Count Fifteen); and (10) possession with intent to distribute MDMA, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count Sixteen). Villanueva-Fabela pled not guilty to all charges.

Before trial, Defendant Villanueva-Fabela filed a motion to suppress, asserting that all evidence seized during the search of trailer C-1 should be excluded. In particular, Villanueva-Fabela argued that any consent given to conduct the search of trailer C-1 was invalid and only given after his allegedly improper detention. After conducting a hearing, the magistrate judge found that Villanueva-Fabela's consent was voluntarily given and recommended that his motion to suppress be denied. Over Villanueva-Fabela's objection, the district court adopted the magistrate judge's recommendation and denied the motion to suppress.

Immediately preceding his jury trial, Villanueva-Fabela entered an unconditional, non-negotiated plea of guilty to Counts Twelve and Thirteen, which counts were based on Villanueva-Fabela's possession of the sawed-off shotgun found in trailer C-1. The district court accepted Villanueva-Fabela's guilty plea, finding that it was made knowingly and voluntarily, and adjudged him guilty of the firearm offenses charged in Counts Twelve and Thirteen. Villanueva-Fabela then proceeded to trial on the remaining counts in the indictment.

At trial, the government called several witnesses who testified about purchasing drugs from Defendant Villanueva-Fabela or from one of his co-conspirators. One witness, Jamie Brown, testified that he began purchasing methamphetamine from Villanueva-Fabela in the summer of 2003. Brown first met Villanueva-Fabela at trailer C-1 and, with the help of Villanueva-Fabela's brother to translate, purchased two ounces of methamphetamine from Villanueva-Fabela. Thereafter, Brown began visiting the trailer park on a daily basis in order to purchase approximately four to six ounces of methamphetamine from Villanueva-Fabela per visit. Brown testified that these transactions had taken place at both trailer C-1 and trailer E-1, but that trailer E-1 was the primary location for these transactions after the first month. Several times Brown gave Villanueva-Fabela firearms instead of cash in order to pay for the methamphetamine he was

8

purchasing. On one occasion, Brown gave Villanueva-Fabela the Mac-11 machine pistol that subsequently was found in trailer E-1 in exchange for some methamphetamine.[1]

Another witness, Laura Adams, testified that she purchased methamphetamine from Brown during the summer of 2003. Adams accompanied Brown on two occasions to a trailer park in which Brown met with Villanueva-Fabela in order to purchase methamphetamine. Adams identified trailer E-1 as the trailer in which these meetings occurred. At one of these meetings, Villanueva-Fabela took Adams into a bedroom and showed her several firearms.

The jury found Villanueva-Fabela guilty on all remaining counts in the indictment except for Count Fourteen.[2] Although the jury made several specific findings with regard to the quantity of methamphetamine involved, there was no specific finding as to the amount of marijuana that Villanueva-Fabela had possessed.

According to a presentence investigation report ("PSI"), Villanueva-Fabela's base offense level was 38, pursuant to U.S.S.G. § 2D1.1(c)(1), based on the jury's

---

[1]The Mac-11 machine pistol found in trailer E-1 was easily identified by Brown at trial as the one he had given Defendant Villanueva-Fabela because of modifications made to the gun to convert it into an automatic weapon.

[2]Count Fourteen charged Defendant Villanueva-Fabela with possession of a Jennings chrome 9mm handgun. Although multiple witnesses testified about the Jennings gun, the gun apparently was not found during any of the searches conducted in this case.

finding that Villanueva-Fabela conspired to possess with intent to distribute at least 15 kilograms of methamphetamine. Because this was the highest possible base offense level under § 2D1.1, the PSI noted that Villanueva-Fabela's possession of marijuana and ecstacy had no bearing on the sentencing calculations. The PSI also recommended a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), based on Villanueva-Fabela's role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. With a total offense level of 42 and a criminal history category of I, the advisory Guidelines range was 360 months to life imprisonment.

Villanueva-Fabela objected to the PSI, arguing, inter alia, that there was no evidence to support the four-level role enhancement. Specifically, Villanueva-Fabela argued that the other participants in the conspiracy were merely drug buyers, and that a buyer-seller relationship was insufficient to warrant the enhancement.

At sentencing, the government conceded that the four-level enhancement was not proper but argued that a two-level role enhancement, pursuant to U.S.S.G. § 3B1.1(c), applied. The government emphasized that Villanueva-Fabela exercised control and authority over other individuals involved in this criminal activity, namely Plancarte, Villanueva-Fabela's two brothers, and at times, Ortiz. To

demonstrate Villanueva-Fabela's role, the government presented the testimony of Brown and Adams.

At sentencing, Brown testified that he purchased methamphetamine from Villanueva-Fabela, but explained that Villanueva-Fabela was not always present at the time of purchase. When this occurred, Brown would call Villanueva-Fabela on his cell phone. Villanueva-Fabela would then talk with either Plancarte or Villanueva-Fabela's brother, whoever was present at the trailer, and one of these individuals would retrieve the methamphetamine for Brown. In addition, Brown sometimes would give Plancarte or Villanueva-Fabela's brother money for drugs that had been fronted to him when Villanueva-Fabela was not present.

At sentencing, Adams testified that the two times she met with Villanueva-Fabela at the trailer park there were always other people around who were associated with Villanueva-Fabela. According to Adams, Villanueva-Fabela would never leave the room, but instead would direct these other people to retrieve whatever he needed, including bringing methamphetamine to sell to Brown or Adams.

The district court agreed that the four-level enhancement was not appropriate, but found that the evidence was sufficient to support a two-level enhancement for Villanueva-Fabela's role in the offense. The court found that

Villanueva-Fabela did direct the activities of Plancarte, and that Villanueva-Fabela's brothers also seemed to be under his control.  The court also found that Villanueva-Fabela had a high level of responsibility, relative to the other members of the conspiracy, and that Villanueva-Fabela exercised management responsibility over the property, the assets, and the activities of the organization.  Accordingly, the district court found that the two-level enhancement applied, resulting in an offense level of 40 and an advisory Guidelines range of 292 to 365 months.

The district court sentenced Villanueva-Fabela to terms of imprisonment of 292 months on Counts One, Eight, and Fifteen, 60 months on Count Two, 240 months on Counts Nine and Sixteen, and 120 months on Counts Twelve and Thirteen, all to run concurrently.  The district court also sentenced Villanueva-Fabela to 60 months' imprisonment on Count Seven, to run consecutively, for a total sentence of 352 months' imprisonment.  This appeal followed.

## II.  DISCUSSION

### A.  Denial of Motion to Suppress

On appeal, Villanueva-Fabela argues that the district court erred by denying his motion to suppress evidence seized from trailer C-1.[3]  Specifically, Villanueva-

_____

[3]We review de novo the district court's denial of a motion to suppress, viewing all evidence in the light most favorable to the party that prevailed below.  United States v.

Fabela argues that his consent to search was not valid because (1) the consent form was not signed in the proper space; (2) the environment was coercive; (3) he was not given <u>Miranda</u> warnings; (4) the consent was merely an acquiescence to a claim of lawful authority after the officers stated that they would get a warrant if they were not given consent to search; and (5) the consent was tainted by his illegal seizure.

The question of whether a consent to search was voluntarily given is a question of fact to be determined from the totality of the circumstances. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047-48 (1973). "A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error." <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir. 2001). After review and oral argument, we conclude that the district court did not clearly err in determining that Villanueva-Fabela's consent was voluntarily given and did not err in denying Villanueva-Fabela's motion to suppress.

First, viewing the evidence in the light most favorable to the government, Villanueva-Fabela consented to the search, both verbally and in writing. As Officer Medina was reading the consent form to Villanueva-Fabela and Lopez,

<u>Yuknavich</u>, 419 F.3d 1302, 1308 (11th Cir. 2005).

13

Villanueva-Fabela indicated that he understood, and he said "yes" in Spanish when asked if he consented. Moreover, although in the wrong space, Villanueva-Fabela nonetheless signed his name at the bottom of the consent form, further indicating that he consented to the search.[4]

Second, the environment in which Villanueva-Fabela gave his consent was not coercive. Although the officers were in full uniforms, there is no evidence that any of the officers at trailer C-1 had drawn their weapons or threatened Villanueva-Fabela in any way. Moreover, although Villanueva-Fabela was placed in handcuffs, this factor alone does not make the consent involuntary. See United States v. Garcia, 890 F.2d 355, 362 (11th Cir. 1989) (finding consent voluntarily given even though fourteen law enforcement agents were present when the defendant was arrested and the defendant was handcuffed at the time he gave consent). In fact, we have found a defendant's consent to be voluntary in situations far more intimidating than the circumstances of this case. See, e.g., United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (concluding consent voluntarily given even though the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him

---

[4]The district court also found that Lopez, the common-law wife of Villanueva-Fabela, independently consented to the search of trailer C-1. The government argues that even if there is some issue about Villanueva-Fabela's consent, the consent of Lopez supports the search. Because we conclude that Villanueva-Fabela's consent was valid, we need not reach this issue.

to the ground at gunpoint"); <u>United States v. Espinosa-Orlando</u>, 704 F.2d 507, 510, 513 (11th Cir. 1983) (concluding consent voluntarily given after four officers had drawn their weapons, asked the defendant to step away from his car, told him to lie on the grass, and asked for consent while he was on the ground and one officer still had his weapon drawn). Accordingly, we agree with the district court that there was nothing particularly coercive about the circumstances surrounding Villanueva-Fabela's consent.

Third, the fact that Villanueva-Fabela may not have been given <u>Miranda</u> warnings prior to giving his consent does not invalidate the consent. This Court previously explained that a consent to search is not a self-incriminating statement, and therefore, that a defendant's consent can be valid even if it was obtained after he had been given <u>Miranda</u> warnings and had invoked his right to remain silent. <u>Hidalgo</u>, 7 F.3d at 1568. Based on this reasoning, we must reject Villanueva-Fabela's argument that his consent was invalid based on the alleged failure to give <u>Miranda</u> warnings.

Fourth, Villanueva-Fabela's consent was not merely an acquiescence to a claim of lawful authority based on Officer Medina's comment that the police would obtain a warrant if he did not consent. Villanueva-Fabela relies on <u>Bumper v. North Carolina</u>, 391 U.S. 543, 88 S. Ct. 1788 (1968) to support his position. In

Bumper, the Supreme Court concluded that a consent to search was invalid if given "only after the official conducting the search has asserted that he possesses a warrant." Id. at 548-50, 88 S. Ct. 1791-92. Here, Officer Medina never asserted that the police already possessed a warrant; he stated only that if Villanueva-Fabela refused to consent to the search the police would obtain a warrant. Accordingly, Bumper does not control the outcome in this case. Rather, this case is more closely akin to Garcia, in which the officers attempting to elicit a consent stated that if the defendant refused to consent, they would have to secure the house and attempt to obtain a search warrant. 890 F.2d at 358. In Garcia, this Court concluded that the defendant's consent was not merely acquiescence to a claim of lawful authority, noting that "[t]he agents never represented to Garcia that they were in possession of a search warrant, or that they could lawfully search his premises without his consent." Id. at 361. The key distinction between Bumper and Garcia is whether the officers ever represented that they could lawfully conduct the search regardless of whether consent was given. In this case, like in Garcia, the officers never represented to Villanueva-Fabela that they possessed a search warrant or otherwise had the authority to search the trailer. Accordingly, we conclude that Villanueva-Fabela's consent was not merely the result of acquiescence to a claim of lawful authority.

16

Fifth, we reject Villanueva-Fabela's argument that his consent was tainted by an illegal seizure. When the officers approached trailer C-1, they smelled a strong odor of marijuana coming from the trailer. This, coupled with the fact that the police were called to the scene to look for a shooting suspect, gave the officers reasonable suspicion to detain Villanueva-Fabela for their own safety, pursuant to Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). Moreover, the fact that Villanueva-Fabela was handcuffed does not necessarily transform the detention into an arrest. See United States v. Acosta, 363 F.3d 1141, 1147 (11th Cir. 2004). Finally, the scope of the detention was carefully tailored to its underlying justification and lasted no longer than was necessary to effectuate the purpose of the stop. See Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983). Accordingly, based on the totality of the circumstances, we conclude that Villanueva-Fabela was properly detained prior to giving consent, and therefore, that his consent was not tainted by an illegal seizure.

Finally, even if we assume arguendo that Villanueva-Fabela's consent was invalid and the search of trailer C-1 was unconstitutional, any error in denying Villanueva-Fabela's motion to suppress was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 22, 87 S. Ct. 824, 827 (1967) (concluding that some constitutional errors are "so unimportant and insignificant" that they may

be deemed harmless). The overwhelming evidence of Villanueva-Fabela's guilt at trial was based on the evidence seized from trailer E-1 and the hotel room, not from trailer C-1, and thus, Villanueva-Fabela cannot show that he was prejudiced by the introduction of the evidence seized from trailer C-1.

Based on the foregoing, we conclude that the district court did not err in denying Villanueva-Fabela's motion to suppress, and we affirm Villanueva-Fabela's convictions.

## B. Enhancement for Villanueva-Fabela's Role in the Offense

Villanueva-Fabela argues that the district court erred by applying a two-level enhancement to his offense level based on his leadership role in the offense, pursuant to U.S.S.G. § 3B1.1(c).[5] Section 3B1.1(c) provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than" one that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(c). "Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993) (quotation omitted). However, "the assertion of control or influence over only one individual is enough to support a § 3B1.1(c)

_____

[5]We review the district court's determination of a defendant's role in the offense for clear error. See United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000).

18

enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000).

We conclude that the district court did not clearly err in determining that Villanueva-Fabela exercised a leadership or management role in the offense. The evidence in this case indicated that Villanueva-Fabela exercised some control over other participants, including Plancarte, Villanueva-Fabela's brothers, and Ortiz, and that Villanueva-Fabela occupied a leadership role in the conspiracy. Given this evidence, we cannot say that the district court clearly erred when it determined that Villanueva-Fabela had occupied a leadership role in the offense. Accordingly, we affirm his sentences.

### III. CONCLUSION

Based on the foregoing reasons, we affirm Villanueva-Fabela's convictions and sentences.

**AFFIRMED.**