[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11487

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL A. BARR,
a.k.a. Mike Diaz,
a.k.a. C.F.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 4:17-cr-00038-MLB-WEJ-1

————————————————

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Michael Barr appeals his convictions for several firearm of-fenses.  He argues the district court should have suppressed evi-dence collected from a warrantless search of his home.  But because Barr consented to the search, we affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.

In the summer of 2017, Barr was living under an alias with his girlfriend, Nadya Diaz.  The two lived on a thirty-acre farm that included pasture land, several barns, and a shooting range.  Whit-field County Sheriff's Office Sergeant Wes Gibson had worked a side job tending to Barr's horses, and he knew Barr by the name "Carlos Fonseca."  He had observed Barr carrying a pistol with him several times and had also noticed a hunting rifle in Barr's home.  Barr and Diaz distanced themselves from Sergeant Gibson after learning that he worked in law enforcement.

In early August, the sheriff's office received reports of do-mestic violence by Barr against Diaz.  A deputy went to the farm to investigate and saw Barr—who identified himself as "Mike"—outside the house wearing an empty pistol holster.  Deputies later realized that "Carlos" was actually Michael Barr.  They checked a

criminal database and confirmed that Barr had active arrest warrants related to controlled substances and illegal possession of a firearm by a convicted felon. When the deputies obtained a photograph of Barr and returned undercover to the house to verify his identity, he answered the door as "Carlos," and they again observed him wearing an empty holster. The deputies positively identified Barr from his photograph, and they planned to arrest him pursuant to the outstanding warrants.

Because the deputies knew Barr owned firearms, they decided to try arresting him by a traffic stop rather than approach him while he was inside the house. They set up surveillance at the farm around 8:00 a.m. on August 31. The deputies did not know if anyone else was at the house, but they saw two vehicles parked in the driveway. A third vehicle on the property belonged to Barr's employee, Michael Hawkins, who was there with his daughter Ashley to help Barr corral horses behind the house.

Around 10:30 a.m., the deputies decided not to wait to perform a traffic stop but to arrest Barr while he was outside the house with the Hawkinses. The deputies placed Barr in plastic handcuffs without incident and read him his *Miranda*[1] rights. Barr asked for an attorney and would not tell the deputies his name. Detective Rickey Holmes turned from Barr, began walking up the driveway toward Mr. Hawkins, and told him, "I have a paper written, but I

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1996).

don't have it signed." Detective Holmes was referring to a search warrant application; he had drafted it before the arrest in case the initial plan to arrest Barr at a traffic stop failed.

Because Barr's hands were cuffed, he had difficulty wiping the sweat from his eyes. He asked Detective Todd Thompson for help, and Detective Thompson asked Barr if someone could go into the house to get something to wipe Barr's face. Barr apparently did not respond, and instead of going inside the house, Detective Thompson asked Mr. Hawkins to wipe the sweat from Barr's face. Barr then asked Mr. Hawkins to "do [him] a favor" and retrieve two cell phones from inside his bedroom. Mr. Hawkins asked if his daughter Ashley would know which bedroom was Barr's.

As Barr and Mr. Hawkins discussed the location of the phones, Detective Holmes announced to Barr, "We're going to escort him in there to get your stuff. We don't want him going in there." Barr turned to look at Detective Holmes, then turned back to Mr. Hawkins and said that the phones were on top of his bed. Detective Holmes believed that Barr had consented to his entering the house because Barr continued to explain where the phones were after being told that the deputies would accompany Mr. Hawkins.

Mr. Hawkins then turned and started walking toward the house; Detective Holmes and two other deputies followed him, and Barr didn't say anything. As the four men entered through the back door of the house, Mr. Hawkins told Detective Holmes that

he was uncomfortable being the first person to go inside. Detective Holmes entered first, and he immediately saw bullets on a table next to the door. Because the officers knew that Barr had kept firearms in the house, Detective Holmes told Mr. Hawkins to wait outside, and he proceeded toward Barr's bedroom. As he entered, Detective Holmes saw the cell phones lying on Barr's bed. He also saw a semiautomatic rifle on the bed and a pistol on the nightstand.

Once Detective Holmes saw the firearms, he conducted a protective sweep of the rest of the house to make sure nobody else was there. When Detective Holmes walked back outside, he explained to Barr that he had not retrieved the phones because he'd found firearms in the house and he knew Barr was a convicted felon. Barr then asked Detective Holmes twice to go back and retrieve the phones so he could call an attorney, but Detective Holmes explained that he would bring the phones down to the jail later. After the deputies left, they obtained a search warrant to seize the firearms and ammunition. They found over seventeen thousand rounds of ammunition, several firearms, and two silencers.

## B.

The government charged Barr in a nine-count superseding indictment. Four of the counts related to the firearms the deputies found while searching Barr's home: one count of conspiring with Diaz to possess a firearm as a convicted felon, two counts of possessing a firearm as a convicted felon, and one count of possessing an unregistered firearm silencer. Barr moved to suppress the

ammunition, silencers, and firearms as the fruit of an unlawful search. The district court held an evidentiary hearing, where deputies testified to the facts laid out above.

The magistrate judge issued a report and recommendation that recommended denying the motion to suppress. The magistrate judge found that Barr had consented to the search because he did not object when the deputies told him they would only let Mr. Hawkins enter the house if Detective Holmes accompanied him.

Barr filed objections to the report and recommendation, but the district court overruled them and adopted it. The district court agreed with the magistrate judge that Barr had voluntarily consented to the search, so the deputies did not need a warrant to enter Barr's home. Barr had argued that he had not consented because he'd merely remained silent as the detectives walked away from him, but the district court found that Barr had consented to the search when he (1) knew that the deputies would not let Mr. Hawkins back into the house unaccompanied and (2) continued to tell Mr. Hawkins where the phones were located.

After the district court denied his motion to suppress, Barr pleaded guilty to the four gun-related counts, and the government agreed to dismiss the remaining counts against him. The district

court then sentenced Barr to time served, plus three years' supervised release.  Barr timely appealed.[2]

## STANDARD OF REVIEW

A district court's ruling on a motion to suppress presents a mixed question of fact and law.  *United States v. Zapata*, 180 F.3d 1237, 1240 (11th Cir. 1999).  We review the district court's factual findings for clear error and the district court's application of the law to those facts de novo.  *See id.*  "[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable" to the party that prevailed before the district court.  *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000).

## DISCUSSION

The Fourth Amendment protects citizens against "unreasonable searches and seizures."  U.S. Const. amend. IV.  Ordinarily, reasonableness "'requires the obtaining of a judicial warrant' before a law enforcement officer can enter a home without permission."  *Lange v. California*, 141 S. Ct. 2011, 2017 (2021).  But a warrantless search is not "unreasonable" where a suspect voluntarily consents to a search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  Whether consent was voluntary, rather than "the

---

[2] In his plea agreement, Barr reserved his right to appeal the district court's denial of his motion to suppress.  The issue is thus properly presented here.  *See United States v. Matchett*, 802 F.3d 1185, 1190–91 (11th Cir. 2015).

product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.*

Several factors—none dispositive—help us determine whether consent was voluntary. *See United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). Those factors include the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of [his] cooperation with police, [his] awareness of his right to refuse to consent to the search, [his] education and intelligence, and, significantly, [his] belief that no incriminating evidence will be found." *Id.* (quoting *United States v. Chemaly*, 664 F.2d 791, 1023–24 (5th Cir. 1981)). While mere "failure to object to a search" does not amount to consent, *see United States v. Gonzalez*, 71 F.3d 819, 829–30 (11th Cir. 1996), the defendant's body language or other conduct can manifest implied consent to a search, *see United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002).

Critically, the mere pressure to consent to a search does not necessarily amount to coercion or duress. In *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989), a team of fourteen federal agents arrested the defendant in front of his house. The defendant—who was handcuffed and did not speak English—spoke to an agent who translated for him. *Id.* at 361 He refused consent to a search of his whole property but said that he would consent to only a limited search. *Id.* The agents declined to conduct a limited search and told the defendant they would seek a warrant if he did

not consent to a search of the entire home, at which point he gave them permission to do so. *Id.* We found the defendant's consent voluntary because the officers never misrepresented their authority to the defendant—they did not tell him that they already had a search warrant. *Id.* Although we conceded that the defendant was "under some pressure to comply" with the request to search his home, there was "no evidence that [the] officers employed any tactics that would augment the degree of coercion that is inherent in any arrest." *Id.* at 362. The question is not whether the defendant *wanted* the search to occur—only whether he was coerced into consenting to the search.

Here, the district court did not clearly err in finding that Barr consented to the search of his home. Barr asked Mr. Hawkins to go into his home and get two cell phones from his bedroom. When Detective Holmes told Barr that he would accompany Mr. Hawkins to the house, Barr turned to look at Detective Holmes before continuing to explain to Mr. Hawkins where the phones were located. Then, Barr said nothing as Detective Holmes and two other deputies followed Mr. Hawkins up to the house. This conduct, while not verbal consent, could be reasonably interpreted as implied consent. *Cf. Ramirez-Chilel*, 289 F.3d at 748, 752 (finding implicit consent to search where defendant stepped aside and allowed officers to enter his home). Viewing the facts in the light most favorable to the district court's ruling, Barr's knowledge that Mr. Hawkins would be escorted by Detective Holmes, his knowing look at Detective Holmes, and his continued direction to Mr.

Hawkins support the district court's finding that Barr accepted Detective Holmes's condition that he be able to escort Mr. Hawkins inside.

Nor did the district court clearly err in finding that Barr consented voluntarily. Although Barr was handcuffed—so his custodial status wasn't voluntary—the deputies did not engage in any tactics to generate greater coercive pressure than that "inherent in any arrest." *Garcia*, 890 F.2d at 362. They made sure that Barr was comfortable by asking Mr. Hawkins to wipe the sweat from his eyes, and they respected his refusal to be questioned after they read his *Miranda* rights. Barr also clearly understood his rights: the primary reason he wanted the phones from his bedroom was so that he could call his attorney as soon as possible. The fact that Barr's illicit firearms were in plain view on his bed—and would thus certainly be discovered if law enforcement entered his bedroom—does weigh somewhat against a finding of voluntariness. *See Blake*, 888 F.2d at 798. But under the totality of the circumstances, we cannot say that the district court clearly erred in finding the consent voluntary.

Barr argues that he did not give voluntary consent to the search but merely acquiesced to a display of lawful authority. And it is true that consent is not voluntary when a law enforcement officer "claims authority to search a home under a warrant" or otherwise "announces in effect that the occupant has no right to resist the search." *Bumper v. North Carolina*, 391 U.S. 543, 559 (1968). But here, officers never announced that they had a warrant. In fact,

Detective Holmes directly announced to Mr. Hawkins, in Barr's presence, that he had a warrant application written but not yet signed. The district court interpreted Detective Holmes's statement that he would accompany Mr. Hawkins not as an assertion of unilateral authority to enter the house, but as a conditional statement that *if* Mr. Hawkins went to the house, deputies would accompany him to ensure their safety. This may have amounted to pressure for Barr to consent to the search—depending on how badly he wanted his phones—but the district court did not clearly err in finding that Barr was not coerced by a show of authority. *Cf. Garcia*, 890 F.2d at 358 (finding consent voluntary notwithstanding the "pressure" agents placed on defendant to permit them to search his house).

## CONCLUSION

The district court did not clearly err when it determined that Barr voluntarily consented to Detective Holmes accompanying Mr. Hawkins into the house and to the bedroom. Because Detective Holmes was lawfully present in the house, his discovery of guns and ammunition lying in plain view did not violate the Fourth Amendment. *See Horton v. California*, 496 U.S. 128, 141–42 (1990). The district court did not err in denying Barr's motion to suppress.

**AFFIRMED.**